

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 21, 2025**

_____
**United States Bankruptcy Judge**

_____

## United States Bankruptcy Court
### Northern District of Texas
### Dallas Division

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Maple Heights Investments, LLC, | § | Case No. 21-30521-swe7 |
| | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| Daniel J. Sherman, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 23-3029-swe |
| | § | |
| T&T Realty Corp.; Louis Lebowitz; 9600 EUS80, Ltd.; Marietta MCRE, LP; MQX/SLJ, LLC; Sandy/MAC Partners, Ltd.; 1250 WDT, Ltd.; Reiger Associates 90-1, Ltd.; SLJ Company LLC; Donald Silverman; and Playa Plata Investments, LLC, | § § § § § § § § § § | |
| | § | |
| Defendants. | § | |

1

## *Findings of Fact and Conclusions of Law*

The Debtor Maple Heights and its subsidiary acquired properties in an area of Dallas known as the "Maple Corridor" with the goal of developing them into a mixed-use project of residential and retail spaces. Helmut Landwehr was the manager who focused on raising capital for the project, primarily from German lenders and investors. Sands Harris was the manager who retained professionals and worked with the city to obtain required permits and zoning changes. And Donald Silverman was the manager with development expertise who purchased properties for the assemblage. The team raised millions of dollars in loans and equity investments and assembled nearly ten acres, but soon Maple Heights needed more money to satisfy maturing loans.

Unable to obtain a traditional bank loan, Maple Heights found alternative financing with Louis Lebowitz, a real-estate developer whose companies agreed to purchase the properties and lease them back with the option for the Maple Heights corporate family to repurchase them in the future for a premium. Those sales benefited Landwehr, Silverman, and Harris, who each received loan repayments and development fees from the sale proceeds. The sales also benefitted Maple Heights, which obtained two additional years to develop the project.

Sadly, the project failed. Landwehr was arrested in Germany on financial-fraud charges, Harris passed away, and Silverman was unable to raise sufficient funds for Maple Heights to repurchase the properties, leading Maple Heights to file Chapter 7 bankruptcy.

In an unusual turn of events, Landwehr raised funds from investors to sue Lebowitz and Silverman and permitted his personal counsel to represent the Chapter 7 trustee in filing this lawsuit, which alleges (among other things) that the project Landwehr worked on and benefitted from was actually a fraud from the start, that the sales to the Lebowitz companies were fraudulent transfers, and that Silverman breached his fiduciary duties by allowing it all to happen.

The evidence at the three-plus week trial did not substantiate the Trustee's claims, so he'll take nothing on them.

# I. Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. § 157 because it involves core matters under 28 U.S.C. § 157(b)(2)(A), (H), and (O). To the extent any matter is not core, the parties have consented, expressly or impliedly, to this Court's entry of final orders and judgments.[1] Venue for this adversary proceeding is proper under 28 U.S.C. § 1409(a).

# II. Factual Background

## A. Maple Heights is formed.

In 2016, Maple Heights Investments, LLC ("**MHI**" or "**Maple Heights**"), a Texas limited liability company, was formed to assemble and develop a mixed-use land project in Dallas, Texas, in an area bounded by Wycliff Avenue, Lucas Drive, Maple Avenue, and Sylvester Avenue:[2]

---

[1] The Plaintiff Chapter 7 trustee and the Lebowitz Defendants (defined below) expressly consented to the Court's entry of final orders and judgments. Plaintiff's First Amended Adversary Complaint [Docket No. 72] ¶ 4; Lebowitz Defendants' Answer and Affirmative Defenses to Plaintiff's First Amended Adversary Complaint [Docket No. 78] ¶ 4. In Silverman's second amended answer, he denied that the Court had jurisdiction, a denial without merit because the Court has at least "related to" jurisdiction over these disputes. Silverman did not otherwise object in his answer to the Court's entry of final orders and judgments, and his second amended answer asks that judgment be entered in his favor. Donald Silverman's Second Amended Answer to Plaintiff's Amended Adversary Complaint [Docket No. 82] at 13. The parties' Second Amended Joint Pre-Trial Order [Docket No. 209] does not list the Court's power to enter final orders and judgments as a contested issue of fact or law. Silverman tried the case without raising the issue. Under these circumstances, the Court finds that Silverman consented to this Court's entry of final orders and judgments.

[2] Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 5; Trustee Ex. 99 at 1. The map shown in the text is from the Lebowitz Defendants' opening PowerPoint presentation [Docket No. 153]. Variations of this map were used throughout trial.

3



That area is located within a broader neighborhood known as the "Maple Corridor," which is located within the bounds of Cedar Springs Road, the Dallas North Tollway, Harry Hines Boulevard, and Inwood Road.[3] MHI's plan was to purchase various parcels, demolish the existing structures, sell the rights to the residential component to developers, and develop the retail component itself.[4] When it was formed, MHI had four managers: Donald Silverman, Sands Harris, Helmut Landwehr, and FIB Texas Co.[5] Each of the three individual managers had a particular role in carrying out the business plan. Harris was responsible for behind-the-scene work such as hiring professionals and dealing with city council.[6] Silverman was mainly responsible for acquiring the real estate.[7] Landwehr was responsible for raising money and generally served as the liaison between MHI and its German stakeholders.[8] FIB Texas

---

[3] Transcript of Hearing Held 8/19/24 [Docket No. 214] at 47:4–50:25.

[4] Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 5.

[5] Trustee Ex. 99 at 5.

[6] Transcript of Hearing Held 8/6/24 [Docket No. 164] at 81:2–17.

[7] *Id.* at 82:2–6.

[8] *Id.* at 39:3–19, 82:7–10.

Co., wholly owned by Landwehr, was a manager that needed to be personally liable for the debts of MHI to comply with German law.[9]

MHI's capital structure largely consisted of direct loans and indirect investments from German lenders. The primary direct lenders were Lotus AG, which loaned MHI $7 million secured by a portion of the subject properties, and Bistum, the Catholic Archdiocese in Bavaria, Germany, which loaned MHI $5 million on an unsecured basis.[10] Though there were a few other relatively minor direct lenders, most of the remaining capital came from indirect lenders. These lenders loaned money to Maple & Wycliff, LCC, which in turn used the money to purchase equity in MHI and pledge the equity as security for the loans.[11] As a result, Maple & Wycliff was MHI's largest equity stakeholder, having invested close to $3.5 million.[12] Apart from the four managers, who each invested $250, and Maple & Wycliff, the only other equity stakeholder was K17 GmbH, which invested around $1 million.[13]

## B.     Maple Heights begins acquiring the subject properties.

In the summer of 2016, MHI began assembling the properties it needed for the project. On May 31, 2016, MHI purchased a 137,327-square-foot property (the "**Sarris Tract**") for $5 million at $36.41 per square foot.[14] On August 4, 2016, MHI purchased 4435 Maple Avenue (the "**Schultz Tract**") for $550,000 at $75.16 per square foot.[15] That same day, MHI also purchased 2424 Arroyo Avenue (the "**Tung Tract**") for $3 million

---

[9] *Id.* at 80:11–16.

[10] Transcript of Hearing Held 8/5/24 [Docket No. 160] at 24:16–24, 34:18–21.

[11] Transcript of Hearing Held 8/6/24 [Docket No. 164] at 76:9–77:3; *See, e.g.*, *In re Maple Heights Invs.*, Case No. 21-30521-swe7, Claim No. 10-1 at 4–5.

[12] Transcript of Hearing Held 8/5/24 [Docket No. 160] at 22:6–11; Trustee Ex. 99 at sched. A.

[13] Transcript of Hearing Held 8/5/24 [Docket No. 160] at 21:21–22:19; Trustee Ex. 99 at sched. A.

[14] Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 13, Ex. A. The Sarris Tract was comprised of 15 different parcels: 2401 Arroyo Avenue, 2429 Arroyo Avenue, 2435 Arroyo Avenue, 2402 Lucas Drive, 2406 Lucas Drive, 2410 Lucas Drive, 2414 Lucas Drive, 2418 Lucas Drive, 2422 Lucas Drive, 2426 Lucas Drive, 2430 Lucas Drive, 2434 Lucas Drive, 2438 Lucas Drive, 4443 Maple Avenue, and 4431 Maple Avenue. *Id.*

[15] *Id.*

at $40 per square foot.[16] When MHI purchased the Sarris, Schultz, and
Tung Tracts in 2016, all three had improvements of some kind. Within
the Sarris Tract, 4443 Maple Avenue had an office building and ware-
house, and 4431 Maple Avenue had a house being used for an antique
business.[17] The Schultz Tract had a building that was leased to a wash-
eteria business.[18] The Tung Tract had a 72-unit apartment complex that
was 90-percent occupied.[19]

MHI continued to assemble properties in the spring and summer of
2017. In March 2017, MHI purchased 4333 Maple Avenue (the "**Burk
Tract**") for $2,265,625 at $145 per square foot.[20] The Burk Tract in-
cluded a vacant 6,000-square-foot medical-office building.[21] In May
2017, MHI purchased 4347 Maple Avenue and 4401 Maple Avenue (to-
gether, the "**Freeway Motors Tracts**") for $2 million each at $132.48
and $127.59 per square foot, respectively.[22] The Freeway Motors Tracts
had two buildings, one on each parcel, that were used for a long-standing
auto-repair business.[23] Additionally, in May 2017, MHI purchased 4501
and 4507 Maple Avenue for $3,056,625 at $97.50 per square foot.[24] 4501
Maple had a 7,000-square-foot retail building with tenants.[25] In June
2017, MHI purchased 4409 Maple Avenue for $720,000 at $91.86 per
square foot and 2435 Hondo Avenue for $450,000 at $60.54 per square
foot.[26] In July 2017, MHI purchased 2439 Hondo Avenue for $353,500 at

---

[16] *Id.*

[17] Transcript of Hearing Held 8/6/24 [Docket No. 164] at 123:4–15.

[18] *Id.* at 116:8–18.

[19] *Id.* at 118:16–24.

[20] Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 13, Ex. A.

[21] Transcript of Hearing Held 8/6/24 [Docket No. 166] at 14:5–11.

[22] *Id.* at 22:10–16, 24:10–13. The Second Amended Joint Pre-Trial Order [Docket No.
209] indicates 4347 Maple was purchased in June, but the parties stipulated at trial
that it was purchased in May.

[23] Transcript of Hearing Held 8/6/24 [Docket No. 166] at 22:10–16, 25:15–19.

[24] Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 13, Ex. A.

[25] Transcript of Hearing Held 8/6/24 [Docket No. 166] at 30:17–25.

[26] Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 13, Ex. A.

$50.97 per square foot.[27] In August 2017, MHI purchased 2439 Wycliff Avenue for $400,000 at $58.14 per square foot.[28]

In addition to acquiring properties directly, MHI formed a wholly owned subsidiary, Arroyo Hondo Investments LLC ("**Arroyo Hondo**"), to purchase certain properties.[29] In three separate transactions in June 2017, Arroyo Hondo acquired five properties. Arroyo Hondo first purchased 2401 and 2407 Hondo Avenue for $460,000 at $31.31 per square foot.[30] It then purchased 2423 Hondo Avenue for $232,500 at $30.52 per square foot.[31] One day later, it purchased 2427 and 2431 Wycliff Avenue for a total of $700,000 at $48.51 and $48.50 per square foot, respectively.[32]

## C.  Maple Heights sells a portion of the properties to the Lebowitz Entities in November 2017.

Though MHI was acquiring properties successfully throughout 2017, it was running out of time and money. MHI needed funds to pay several loans that were due in the first quarter of 2018.[33] Moreover, by August 2017, MHI was in default on the $5 million loan from Bistum.[34] On August 14, 2017, MHI, Arroyo Hondo, and Silverman signed a "Standstill Agreement" with Bistum under which Bistum agreed not to sue MHI on the loan for 75 days so long as MHI provided progress reports every other week on its efforts to obtain refinancing.[35]

To make matters worse, by the summer of 2017, Landwehr was under investigation in Germany for allegedly fraudulent conduct in connection with investments in entities he was involved with, including Maple Heights.[36] Landwehr continued to raise at least some money for the

---

[27] *Id.*

[28] *Id.*

[29] Transcript of Hearing Held 8/6/24 [Docket No. 166] at 35:19–36:13.

[30] Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 13, Ex. A.

[31] *Id.*

[32] *Id.*

[33] Transcript of Hearing Held 8/6/24 [Docket No. 166] at 49:10–50:10.

[34] Transcript of Hearing Held 8/5/24 [Docket No. 160] at 36:13–16.

[35] Trustee Ex. 98.

[36] Transcript of Hearing Held 8/5/24 [Docket No. 160] at 44:22–45:1.

project despite expressing doubts about his ability to do so.[37] Silverman, however, was concerned that relying too heavily on Landwehr left MHI in a vulnerable position, so MHI continued exploring other sources of capital.[38]

It was during this search for capital that MHI began dealing with Louis Lebowitz, the sole owner of SLJ Company, LLC ("**SLJ**"). SLJ forms real-estate investment partnerships through limited partnerships or LLCs of which SLJ is the general partner or manager.[39] SLJ manages more than 100 of such entities, including Marietta MCRE, LP ("**Marietta**"), 9600 EUS80, Ltd. ("**EUS80**"), Sandy/MAC Partners, Ltd. ("**Sandy/MAC**"), 1250 WDT, Ltd. ("**WDT**"), Reiger Associates 90-I, Ltd. ("**Reiger**"), and MQX/SLJ, LLC ("**MQX/SLJ**") (those six entities together, the "**Lebowitz Entities**").[40] When purchasing real estate, Lebowitz typically used his shell corporation, T&T Realty Corporation ("**T&T Realty**," and together with SLJ, Lebowitz, and the Lebowitz Entities, the "**Lebowitz Defendants**"), to hold sale contracts during the due-diligence period.[41] Once Lebowitz determined that a sale was moving forward, T&T Realty assigned the contract to the entity prepared to close and take title.[42] The acquiring entity typically was executing like-kind exchanges under Internal Revenue Code section 1031.[43]

During Lebowitz's introduction to Sands Harris in the summer of 2017,[44] Harris explained the project to Lebowitz and asked to borrow money,[45] but Lebowitz was not interested in being a lender.[46] In a meeting with Harris and Silverman shortly thereafter, however, Lebowitz suggested doing a sale-leaseback with an option to repurchase, a

---

[37] Transcript of Hearing Held 8/6/24 [Docket No. 166] at 49:23–50:3.

[38] *Id.* at 50:4–10.

[39] Transcript of Hearing Held 8/12/24 [Docket No. 194] at 7:14–25.

[40] *Id.* at 10:19–13:13.

[41] Transcript of Hearing Held 8/13/24 [Docket No. 200] at 20:16–21:10.

[42] *Id.* at 20:16–21:10.

[43] *Id.* at 18:20–20:7.

[44] Transcript of Hearing Held 8/12/24 [Docket No. 194] at 23:6–12.

[45] *Id.* at 25:9–16.

[46] *Id.* at 25:13–16.

transaction Lebowitz had done multiple times with developers in the past.[47] This structure was not MHI's first choice, but MHI had failed to obtain any other refinancing. MHI was confident it could complete the project if given more time and capital.[48]

The parties seemingly came to terms on August 3, 2017, signing two separate contracts. One was for the purchase of the Sarris Tract, the Tung Tract, 4501 and 4507 Maple Avenue, and the Schultz Tract for $13 million, or roughly $52 per square foot.[49] The second contract was for the purchase of the entire Freeway Motors Tract for $2 million, or roughly $63.90 per square foot.[50] Lebowitz thus originally agreed to pay approximately $15 million for 281,730 square feet of property, or roughly $53 per square foot. The Freeway Motors deal fell through, however, when Lebowitz's title company would not insure one of the parcels in the Freeway Motors Tract because of a *lis pendens* against the property.[51] The other contract ultimately did not survive either because it was eventually replaced by a new, final sale contract.[52]

On October 18, 2017, MHI and T&T Realty signed a final sale contract (the "**October 2017 Sale Contract**") for the Sarris Tract, the Schultz Tract, the Tung Tract, 4501 and 4507 Maple Avenue, 4401 Maple Avenue, 4409 Maple Avenue, 2435 Hondo Avenue, and 2439 Hondo Avenue.[53] By this point, all the structures on these properties had been demolished, except for the antique business on 4431 Maple Avenue and the retail building on 4501 Maple Avenue, which had been gutted and vacated.[54] The purchase price was $13 million, or $45 per square foot.[55] As allowed by the contract, T&T Realty assigned its contractual rights

---

[47] *Id.* at 26:12–24.

[48] Transcript of Hearing Held 8/6/24 [Docket No. 166] at 51:14–20; Transcript of Hearing Held 8/13/24 [Docket No. 200] at 38:21–24.

[49] Trustee Ex. 13; Transcript of Hearing Held 8/13/24 [Docket No. 200] at 61:1–11.

[50] Lebowitz Ex. 83.

[51] Transcript of Hearing Held 8/13/24 [Docket No. 204] at 17:12–18:4, 19:10–12.

[52] Transcript of Hearing Held 8/13/24 [Docket No. 200] at 61:17–20.

[53] Trustee Ex. 85.

[54] Transcript of Hearing Held 8/13/24 [Docket No. 200] at 76:18:25.

[55] Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 14.

to Marietta and EUS80.[56] On November 30, 2017, EUS80 closed on 4501 and 4507 Maple Avenue, the Sarris Tract, the Schultz Tract, and the Tung Tract for $11.52 million cash.[57] Marietta closed on 4401 Maple Avenue, 4409 Maple Avenue, 2435 Hondo, and 2439 Hondo for $1.48 million cash the same day.[58]

As part of the transaction, Marietta and EUS80 leased the properties to Playa Plata Investments, LLC ("**Playa Plata**"), a wholly owned subsidiary of MHI, for a one-year term starting December 1, 2017.[59] Playa Plata was required to deposit $650,000 in a lease escrow as prepayment for rent and other lease expenses.[60] In the lease, Playa Plata received an option to purchase the properties for $14.95 million—a 15-percent premium over the price paid by Marietta and EUS80.[61] The lease also contained an option for Playa Plata to extend the lease for another year. If exercised, Playa Plata would be required to deposit $816,000 in a lease escrow and to pay a five-percent "good faith" nonrefundable deposit against the purchase-option price, which would increase by 15 percent during the extension term.[62]

MHI received $13 million in the sales to Marietta and EUS80. MHI immediately used most of that money to pay off two of MHI's creditors. The Lotus AG secured loan was repaid with $7,393,150 applied directly from escrow.[63] Another $450,000 was escrowed to a title company to pay off an outstanding debt of $324,326 owed to German investor Gabrielle Lechler.[64] After these payments and closing costs were deducted, MHI netted approximately $5 million.

---

[56] Id.

[57] Id. ¶ 15, Ex. A

[58] Id. ¶ 17, Ex. A.

[59] Trustee Ex. 142.

[60] Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 16.

[61] Id. ¶¶ 15, 17; Trustee Ex. 142 at 12.

[62] Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 16; Trustee Ex. 142 at 12–13.

[63] Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 18; Trustee Ex. 21 at 2.

[64] Trustee Ex. 20 at 1; Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 18. The remaining $125,673 was eventually released by the title company and transferred to MHI later in 2018.

The day after the closings, MHI wired $4 million to Playa Plata, and
Playa Plata paid the $650,000 lease escrow.[65] MHI also used the net sale
proceeds to pay debts and other fees, including the following payments
to insiders such as Landwehr:

- Conrad Stiftung, a German foundation chaired by Landwehr, re-
  ceived a $356,338 loan repayment.[66]

- LFRC, LLC—controlled by Landwehr and Silverman—received a
  $302,000 loan repayment.[67]

- MQ Rockwall, a project involving Silverman and Landwehr, re-
  ceived $10,000.[68]

- Landwehr himself received a $400,000 loan repayment and
  $193,800 for placement fees.[69]

- Madaus Capital Partners received $141,300 in placement fees.[70]
  Thomas Landwehr, Landwehr's brother, was a partner in
  Madaus Capital Partners, a German broker/investment company,
  which helped raise money for investments in a number of Silver-
  man-related projects.[71] Veit Madaus was the founder of Madaus
  Capital Partners.[72] Marc Tetzner, also with Madaus Capital Part-
  ners, was the point man on a number of Silverman-related pro-
  jects, including MHI.[73]

---

[65] Transcript of Hearing Held 8/5/24 [Docket No. 160] at 59:11–15; Trustee Ex. 157;
Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 19.

[66] Trustee Ex. 58; Transcript of Hearing Held 8/6/24 [Docket No. 166] at 74:15–75:2.

[67] Trustee Ex. 58; Transcript of Hearing Held 8/6/24 [Docket No. 166] at 75:3–14.

[68] Trustee Ex. 58; Transcript of Hearing Held 8/6/24 [Docket No. 166] at 75:15–24.

[69] Trustee Ex. 58; Transcript of Hearing Held 8/6/24 [Docket No. 166] at 76:3–10,
19–25.

[70] Trustee Ex. 58; Transcript of Hearing Held 8/6/24 [Docket No. 166] at 77:1–6.

[71] Transcript of Hearing Held 8/6/24 [Docket No. 164] at 77:7–78:18.

[72] *Id*. at 78:14–15. The reference to "Vight Mattouse" in the transcript is intended to
mean "Veit Madaus."

[73] Transcript of Hearing Held 8/5/24 [Docket No. 160] at 128:19–25.

- Sands Harris received $180,000 in development fees.[74]

- MDC—controlled by Silverman—received $240,000, $60,000 of which was repayment of a loan and $180,000 of was paid to Silverman for development fees.[75]

Meanwhile, MHI maintained its vision and continued to assemble the project. In October 2017, MHI purchased 2435 Wycliff Avenue for $600,000 at $78.49 per square foot.[76] In November 2017, Arroyo Hondo purchased 2411 Hondo Avenue for $392,200 at $52.67 per square foot.[77] In December 2017, Arroyo Hondo purchased 2431 Hondo Avenue for $431,500 at $60.82 per square foot[78] and 2430 Hondo Avenue for $425,000 at $57.71 per square foot.[79] Arroyo Hondo purchased two more parcels in March 2018: 2423 Wycliff Avenue for $365,000 at $45.91 per square foot and 2417 Wycliff Avenue for $260,000 at $36.92 per square foot.[80]

## D. Maple Heights sells the remaining properties to the Lebowitz Entities in July and September 2018.

MHI's financial trouble worsened in 2018. Helmut Landwehr was arrested in Germany in January and resigned from MHI in March.[81] By June, MHI did not have the money to pay the $10.15 million it owed on long-term notes.[82] Nor did MHI have any plan in place to raise the $14.95 million needed for Playa Plata to exercise the purchase option that expired in six months.[83]

---

[74] Trustee Ex. 58; Transcript of Hearing Held 8/6/24 [Docket No. 166] at 77:14–16.

[75] Trustee Ex. 58; Transcript of Hearing Held 8/6/24 [Docket No. 166] at 77:7–13; Transcript of Hearing Held 8/5/24 [Docket No. 160] at 60:15–22.

[76] Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 13, Ex. A.

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.* ¶ 21.

[82] Trustee Ex. 95; Transcript of Hearing Held 8/5/24 [Docket No. 160] at 93:11–16.

[83] Transcript of Hearing Held 8/5/24 [Docket No. 160] at 96:22–97:2.

Feeling the financial pressure, MHI approached Lebowitz in June 2018 to discuss selling the remainder of the properties.[84] On June 8, 2018, MHI and Arroyo Hondo each signed a contract with T&T Realty for the sale of certain properties.[85] MHI agreed to sell 4333 Maple Avenue, 4347 Maple Avenue, 2435 Wycliff Avenue, and 2439 Wycliff Avenue for $2,036,070 at $45 per square foot.[86] Arroyo Hondo agreed to sell 2407 Hondo Avenue, 2411 Hondo Avenue, 2423 Hondo Avenue, 2430 Hondo Avenue, 2431 Hondo Avenue, 2401 Hondo Avenue, 2417 Wycliff Avenue, 2423 Wycliff Avenue, 2427 Wycliff Avenue, and 2431 Wycliff Avenue for $2,211,660 at $30 per square foot.[87] When the contracts were signed, Lebowitz believed he was paying $45 per square foot for the retail-zoned lots and $30 per square foot for the townhome-zoned lots.[88] At some point, however, Lebowitz discovered that 2435 Wycliff and 2439 Wycliff were actually zoned townhome and asked MHI to lower the purchase price to reflect $30 per square foot for those lots.[89] Instead of lowering the price, Arroyo Hondo threw an additional property in the deal—2414 Hondo Ave—which Arroyo Hondo had purchased on August 8, 2018, for $255,000 at $33.83 per square foot.[90]

T&T Realty transferred its rights under the 2018 contracts to four separate entities: Sandy/MAC, WDT, Reiger, and MQX/SLJ. On July 30, 2018, Sandy/MAC closed on 2411 Hondo Avenue, 2423 Hondo Avenue, 2430 Hondo Avenue, 2431 Hondo Avenue, 2417 Wycliff Avenue, 2423 Wycliff Avenue, 2427 Wycliff Avenue, and 2431 Wycliff Avenue for $1.8 million.[91] That same day, WDT closed on 2401 Hondo Avenue, 2407 Hondo Avenue, and 2439 Wycliff Avenue for $618,060.[92] On September

---

[84] *Id.* at 97:3–6.

[85] The Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 23 states that both contracts were entered on June 18. However, the contracts themselves are dated June 8, and trial testimony indicates that the contracts were entered on June 8. *See* Trustee Ex. 140; Trustee Ex. 87; Transcript of Hearing Held 8/12/24 [Docket No. 205] at 11:2–8.

[86] Trustee Ex. 140.

[87] Trustee Ex. 87.

[88] Transcript of Hearing Held 8/13/24 [Docket No. 204] at 21:10–16.

[89] *Id.* at 21:15–22.

[90] *Id.* at 22:5–9; Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 13, Ex. A.

[91] Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 24; Trustee Ex. 25.

[92] Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 25; Trustee Ex. 22.

13

12, 2018, Reiger closed on 2414 Hondo Avenue and 2435 Wycliff Avenue for $495,000,[93] and MQX/SLJ closed on 4333 Maple Avenue and 4347 Maple Avenue for $1,305,000.[94]

Like the 2017 deal, the 2018 deal (which included two simultaneously executed sale contracts and two different closing dates) included a lease-back and purchase option. WDT and Sandy/MAC leased their properties to Playa Plata on August 1, 2018, for one year.[95] WDT and Sandy/MAC also purported to lease under the same terms the properties Reiger and MQX/SLJ had not yet closed on.[96] Playa Plata was required to escrow an initial $212,000.[97] During the lease term, Playa Plata had the option to purchase the properties—including the Reiger and MQX properties—for $4,757,500 and the option to extend the lease for an additional year.[98] The extension option required an additional $250,000 escrow and came with a 15-percent increase in the purchase option price during the second year.[99]

### E.    Maple Heights cannot afford to purchase the properties back or extend the leases.

In November 2018, Playa Plata notified Lebowitz of its intent to extend the 2017 lease, and it paid the required escrow and all but $121,169 of the five-percent good-faith deposit.[100] Sometime in the summer of 2019, Silverman told Lebowitz that Playa Plata intended to extend the 2018 lease,[101] but by September 2019, Playa Plata had not paid any of the amount required to extend the 2018 lease or the $121,169 deficiency for the 2017 lease extension.[102] Lebowitz wrote a letter to Playa Plata in September 2019 notifying it that both leases—and therefore, the

---

[93] Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 26; Trustee Ex. 24.

[94] Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 27; Trustee Ex. 23.

[95] Trustee Ex. 78.

[96] *Id.*; Transcript of Hearing Held 8/5/24 [Docket No. 160] at 113:1–20.

[97] Trustee Ex. 78.

[98] *Id.*

[99] *Id.*

[100] Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 28; Trustee Ex. 165.

[101] Transcript of Hearing Held 8/13/24 [Docket No. 204] at 58:2–9.

[102] Trustee Ex. 165.

purchase options—had expired by their own terms.[103] In the same letter, Lebowitz offered to reinstate the leases if Playa Plata paid the amount required to extend both leases by the end of September 2019.[104]

MHI's German investors were unhappy when they learned that the leases and purchase options had expired.[105] By then, Madaus Capital Partners was heavily involved in MHI's efforts to salvage the project. Earlier in the summer of 2019, Madaus expressed interest in loaning $5 million to repurchase the properties sold in 2018.[106] Though that loan never materialized, Madaus remained highly involved. There was some talk that Mark Tetzner, a Madaus representative, was planning to join MHI as a comanager and fill the void left by Landwehr.[107] Tetzner, Silverman, and Lebowitz met in Dallas in September 2019.[108] Tetzner indicated that Madaus was prepared to put up the remaining equity once a loan from Romspen—a potential lender—came through based on a certain appraisal value.[109]

Earlier in the spring of 2019, Silverman went to Todd McNeil at Metropolitan Capital Advisers to try and raise $27 million to purchase the properties back.[110] McNeil prepared an offering memorandum that valued the properties "as is" at $95 per square foot.[111] This valuation was "backed into" to support a 65-percent loan-to-value ratio.[112] McNeil sent the memorandum to approximately 40 different capital sources, but he received interest from only two entities.[113] One of those entities, Romspen, was potentially willing to lend money, but the most Romspen

---

[103] *Id.*

[104] *Id.*

[105] Trustee Exs. 43, 44.

[106] Trustee Ex. 40.

[107] Transcript of Hearing Held 8/13/24 [Docket No. 204] at 60:23–61:13.

[108] Transcript of Hearing Held 8/12/24 [Docket No. 205] at 55:6–12.

[109] Transcript of Hearing Held 8/13/24 [Docket No. 204] at 61:7–22; Trustee Ex. 49.

[110] Transcript of Hearing Held 8/21/24 [Docket No. 230] at 42:13–25.

[111] *Id.* at 51:6–20; Trustee Ex. 1 at 24.

[112] Transcript of Hearing Held 8/21/24 [Docket No. 230] at 54:1–14. In other words, the value was completely detached from reality and was selected solely to try to raise funds.

[113] Transcript of Hearing Held 8/21/24 [Docket No. 232] at 7:8–8:3.

was potentially willing to lend was not enough to repurchase the properties.[114]

As Tetzner indicated to Lebowitz, Madaus was prepared to cover the difference. To move things along, SLJ agreed three different times to reinstate the leases if Playa Plata put up the money needed to extend them.[115] In the first two agreements, Playa Plata had failed to make the required payments on time.[116] SLJ agreed for a third and final time to reinstate the leases if Playa Plata paid $150,000 by October 7, 2019, and the remainder of the balance by the earlier of October 22 or the time Playa Plata exercised the purchase options,[117] but in any event no later than October 31.[118] In addition to agreeing to reinstate the leases, Lebowitz agreed to remove four of the properties from the deal, reducing the purchase-option price by $2.2 million.[119] Silverman requested that reduction to reduce the amount of equity needed to complete the deal with financing from Romspen.[120]

Tetzner—on Playa Plata's behalf—wired Lebowitz $150,000 by the October 7 deadline, but Tetzner and Madaus refused to pay any more money before they received a firm commitment on a loan to finish the deal.[121] That never happened, and October 22 came and went without any additional payments.[122] On October 23, Lebowitz informed Silverman and Playa Plata that the leases and purchase options were terminated.[123] Nonetheless, Silverman reassured Lebowitz that a loan could be worked out.[124] Lebowitz, eager to sell the properties, gave Silverman

---

[114] *Id.* at 33:3–21; Trustee Ex. 49.

[115] Transcript of Hearing Held 8/13/24 [Docket No. 204] at 62:6–10; Trustee Exs. 81, 150.

[116] Transcript of Hearing Held 8/13/24 [Docket No. 204] at 62:15–19.

[117] Trustee Ex. 150.

[118] *Id.*

[119] *Id.*

[120] Transcript of Hearing Held 8/5/24 [Docket No. 160] at 144:6–145:7.

[121] Transcript of Hearing Held 8/13/24 [Docket No. 204] at 64:9–19.

[122] *Id.* at 64:10–11.

[123] *Id.* at 64:23–25.

[124] *Id.* at 65:1–17.

and Tetzner until the end of the year to come up with the money.[125] They never did.[126]

## F.    Lebowitz moves on from Maple Heights.

Compounding MHI's struggles, Harris passed away in December 2019.[127] Once Silverman told Lebowitz that a deal would not be completed by the end of the year, Lebowitz started looking elsewhere to sell the properties. In mid-December 2019, SLJ sent out 5,000 copies of an offering memorandum,[128] prompting two purchase offers.[129] SLJ rejected both.[130]

In April 2020, Silverman referred Lebowitz to Buck Acquisitions, which (much to Lebowitz's chagrin) wanted to do a joint venture rather than purchase the properties.[131] Lebowitz believed the proposed JV, described in a complicated term sheet, was simply an attempt by Buck to tie up the properties at a small cost to see if Buck could increase the value and walk away with a piece of that value.[132] At one point during the negotiations, Lebowitz—fed up with Buck's tie-up strategy and apparently feeling feisty—suggested that Buck should just contract to purchase the properties for $120.50 per square foot, an unreasonably high number that was designed to make Buck go away.[133] Buck went away.

---

[125] *Id.* at 65:6–9.

[126] *Id.* at 65:22–23.

[127] Transcript of Hearing Held 8/20/24 [Docket No. 220] at 87:3–4.

[128] Transcript of Hearing Held 8/12/24 [Docket No. 205] at 71:13–14, 73:13–23; Trustee Ex. 182.

[129] Transcript of Hearing Held 8/13/24 [Docket No. 204] at 68:12–15

[130] *Id.* at 69:6–18.

[131] Trustee Ex. 2; Transcript of Hearing Held 8/12/24 [Docket No. 205] at 84:19–24.

[132] Transcript of Hearing Held 8/13/24 [Docket No. 204] at 82:5–11.

[133] Transcript of Hearing Held 8/13/24 [Docket No. 204] at 82:12–23; Transcript of Hearing Held 8/12/24 [Docket No. 205] at 92:5–17.

Lebowitz received another JV proposal in 2021 from Goldenrod.[134] Goldenrod, like Buck, was not willing to purchase the properties as-is and as-zoned.[135] Lebowitz was not interested.[136]

The Lebowitz Entities remain the owners of the properties.

### III.   Procedural Background

MHI filed for chapter 7 bankruptcy on March 23, 2021.[137] Daniel Sherman was appointed as the Chapter 7 trustee (the "**Trustee**"). Sometime thereafter, Todd Harlow of Frost Brown Todd ("**FBT**"), Landwehr's counsel, approached the Trustee to set up a Zoom meeting between Landwehr and the Trustee.[138] Landwehr told the Trustee he felt wronged by how the MHI project played out,[139] so Landwehr had raised money from other investors to prosecute this Adversary Proceeding.[140] In the main bankruptcy case, the Trustee filed an application to retain FBT, but Silverman objected, alleging FBT held an interest adverse to the Debtor's estate[141] due to FBT's representation of Landwehr and his affiliates in a web of state-court litigation between MHI, Silverman, Landwehr, and MHI's creditors.[142] Based on the information available at the time, the Court overruled Silverman's objection and allowed the Trustee to retain FBT under Bankruptcy Code section 327(e).[143] As

---

[134] Transcript of Hearing Held 8/13/24 [Docket No. 204] at 86:2–7.

[135] *Id*. at 87:21–25.

[136] *Id*. at 88:1–3.

[137] *See In re Maple Heights Invs.*, No. 21-30521-swe7 (Bankr. N.D. Tex. filed Mar. 24, 2021).

[138] Oral Argument at 1:36, *In re Maple Heights Invs.*, No. 21-30521-swe7 (Docket No. 93).

[139] *Id*.; Transcript of Hearing Held 8/23/24 [Docket No. 236] at 16:25–17:5.

[140] Transcript of Hearing Held 8/23/24 [Docket No. 236] at 19:11–22.

[141] Response to Application to Employ Special Counsel, *In re Maple Heights Invs.*, No. 21-30521-swe7 (Docket No. 42).

[142] Amended Application to Employ Special Counsel at Ex. A, *In re Maple Heights Invs.*, No. 21-30521-swe7 (Docket No. 41); Response to Application to Employ Special Counsel at 4–5, *In re Maple Heights Invs.*, No. 21-30521-swe7 (Docket No. 42).

[143] *See* Amended Application to Employ Special Counsel at 2, *In re Maple Heights Invs.*, No. 21-30521-swe7 (Docket No. 41); Order Authorizing Employment of Special Counsel for a Specific Purpose, *In re Maple Heights Invs.*, No. 21-30521-swe7 (Docket No. 49).

explained later, however, FBT's dual representation of Landwehr and the Trustee has proved awkward given how this lawsuit played out.

On March 23, 2023, the Trustee filed a complaint initiating this Adversary Proceeding.[144] The Court dismissed that original complaint in part without prejudice for failure to state a claim,[145] so the Trustee filed an amended complaint (the "**Complaint**")[146] asserting five counts:

- Count I seeks to avoid the property transfers to the Lebowitz Entities as actual fraudulent transfers (as to present and future creditors) under Bankruptcy Code section 544 and Texas Uniform Fraudulent Transfer Act ("**TUFTA**") section 24.005(a)(1). The count also seeks to recover the properties or their value from the Lebowitz Defendants under Bankruptcy Code section 550.

- Count II seeks to avoid the property transfers to the Lebowitz Entities as constructive fraudulent transfers (as to present and future creditors) under Bankruptcy Code section 544 and TUFTA section 24.005(a)(2). The count also seeks to recover the properties or their value from the Lebowitz Defendants under Bankruptcy Code section 550.

- Count III seeks to avoid the property transfers to the Lebowitz Entities as constructive fraudulent transfers (as to present creditors) under Bankruptcy Code section 544 and TUFTA section 24.006(a). The count also seeks to recover the properties or their value from the Lebowitz Defendants under Bankruptcy Code section 550.

- Count IV seeks damages against Silverman for breach of fiduciary duties.

---

[144] *See* Plaintiff's Adversary Complaint [Docket No. 1].

[145] Order Granting Lebowitz-Affiliated Defendants' Motion to Dismiss Plaintiff's Adversary Complaint [Docket No. 53].

[146] *See* Plaintiff's First Amended Adversary Complaint [Docket No. 72].

- Count V[147] seeks recovery against Silverman for money had and received. The Trustee abandoned this count at trial.[148]

The Court held a three-plus week trial in August and September 2024. After the Trustee concluded his case-in-chief, the Lebowitz Defendants filed a motion under Rule 52(c) of the Federal Rules of Civil Procedure for judgment on partial findings (the "**Motion**"), arguing that the Trustee can't avoid the transfers by Arroyo Hondo because they didn't involve transfers of the Debtor's property, a threshold requirement of Bankruptcy Code section 544(b).[149] The Lebowitz Defendants said the Court's ruling on the Motion would not change the evidence presented at trial, so the Court declined to consider rendering judgment until the close of the evidence, instead allowing the parties to argue their positions at closing.[150] The Court thus denies the Motion as moot.

After closing arguments, the Court took the trial under advisement.[151]

## IV.  Legal Analysis

### A.    None of the transfers to the Lebowitz Entities in 2017 or 2018 are avoidable by the Trustee under Section 544(b).

To maximize the debtor's bankruptcy estate, Bankruptcy Code section 544 provides a trustee with powers to avoid certain prepetition transfers made by the debtor—popularly known as a trustee's "strong arm powers."[152] One of those powers is section 544(b)(1), which allows a trustee to "avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law" by an unsecured creditor holding an

---

[147] Mistakenly labeled "Count VII" in the Complaint.

[148] Transcript of Hearing Held 9/3/24 [Docket No. 273] at 3:20–4:11. Playa Plata is a named defendant, but no count appears directed at it.

[149] *See* Lebowitz Defendants' Motion for Judgment on Partial Findings [Docket No. 206].

[150] Transcript of Hearing Held 8/19/24 [Docket No. 214] at 15:15–16:14. The Court has treated the Motion and the Trustee's response as supplemental trial briefing. *See* Plaintiff's Response to Lebowitz Defendants' Motion for Judgment on Partial Findings [Docket No. 241].

[151] Each party has requested attorney's fees, but they have all agreed to reserve testimony on that issue until after the Court rules on the substantive counts. Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 67.

[152] 5 COLLIER ON BANKRUPTCY § 544.01 (16th ed. 2024).

allowable claim.[153] Unlike a trustee's direct power to avoid fraudulent transfers under section 548, the power under section 544(b) is derivative; a trustee "steps into the shoes" of an actual unsecured creditor that could have avoided the transfer on the date of the bankruptcy.[154] There is no dispute that the applicable law in this case is TUFTA, but the Trustee cannot prevail on his section 544(b) claim by merely showing that the transfers to the Lebowitz Entities are avoidable under TUFTA. The Trustee must also prove (1) there is an actual unsecured creditor with an allowable claim that could have brought the TUFTA action, and (2) the debtor had an interest in the property transferred.[155]

Through section 544(b), the Trustee seeks to avoid not only the transfers made by Maple Heights, but also the transfers made by Arroyo Hondo. The Trustee falls short on both attempts. First, the Trustee failed to show that Maple Heights had an interest in the properties Arroyo Hondo transferred. And second, the Trustee failed to show that the properties Maple Heights transferred are avoidable under TUFTA as actual or constructive fraudulent transfers.

### 1. Maple Heights did not have an interest in the property owned and transferred by Arroyo Hondo—a nondebtor—a threshold requirement of section 544(b).

The parties stipulate that Arroyo Hondo was the purchaser and title owner of the properties it later transferred to the Lebowitz Entities.[156] Nonetheless, the Trustee contends that MHI had an interest in the properties as the "true" owner.[157]

---

[153] 11 U.S.C. § 544(b)(1).

[154] *The Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 260 (5th Cir. 2010).

[155] *ASARCO L.L.C. v. Ams. Mining Corp.*, 396 B.R. 278, 316 (S.D. Tex. 2008).

[156] Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 13 ("The acquisitions by the Debtor and Arroyo Hondo are set forth in greater detail in the attached Exhibit A"). The attached "Exhibit A" is a chart detailing MHI's and Arroyo Hondo's respective acquisitions of the properties and the subsequent sales to the Lebowitz Entities. Arroyo Hondo, not Maple Heights, is listed as the "purchaser" for several of the subject properties. *See also* Transcript of Hearing Held 9/3/24 [Docket No. 273] at 145:22–23 (Trustee's counsel stating: "Arroyo was the title owner of the property. Yes. The stipulated fact is that.").

[157] Transcript of Hearing Held 8/30/24 [Docket No. 262] at 102:6–103:21.

Property interests are creatures of state law, and absent a controlling federal interest, state law determines the existence and extent of a debtor's interest in property under section 544(b).[158] Texas law recognizes that a legal title owner is not always the true owner, at least with respect to bank accounts.[159] In those circumstances, courts look to the person who possesses and controls the property rather than the person who has legal title to it.[160] In *IFS Financial*, the bankruptcy court applied that principle to find that nearly $3 million in payments to the defendants were fraudulent transfers under section 544(b) even though the funds were transferred from a bank account that was not in the name of the debtor.[161] The court noted that, independent of any veil-piercing theories, a plaintiff bringing a section 544(b) claim can establish that the debtor has an interest in property legally titled in another by showing the debtor exercises full possession and control over the property.[162] In the *IFS* case, the debtor, rather than the legal owner of the bank account, had the exclusive power to withdraw and otherwise control the funds in the account.[163] In other words, the *IFS* case involved a debtor's complete and *direct* control over property. MHI, however, did not have complete and direct control over Arroyo Hondo's properties. A stipulation that Arroyo Hondo was the purchaser of the properties is tantamount to a stipulation that the seller conveyed the properties to Arroyo Hondo. Unless expressly limited, the estate conveyed was a fee simple[164]—an estate that gives the owner "unlimited power of disposition in perpetuity without condition or limitation."[165] Thus, when Arroyo Hondo "purchased" the properties, it acquired the absolute control of fee simple ownership.

---

[158] *Butner v. U.S.*, 440 U.S. 48, 55 (1979); *see also Stettner v. Smith (In re IFS Fin. Corp.)*, 669 F.3d 255, 261–62 (5th Cir. 2012) (analyzing the "interest of the debtor in property" in section 544 by reference to state law).

[159] *Silsbee State Bank v. French Mkt. Grocery Co.*, 132 S.W. 465, 466–67 (Tex. 1910).

[160] *Smith v. Suarez (In re IFS Fin. Corp.)*, 417 B.R. 419, 435 (Bankr. S.D. Tex. 2009).

[161] *Id*. at 441.

[162] *Id*. at 433–35.

[163] *Id*. at 437.

[164] TEX. PROP. CODE § 5.001(a) ("An estate in land that is conveyed or devised is a fee simple unless the estate is limited by express words . . . .").

[165] *Cooley v. Williams*, 31 S.W.3d 810, 813 (Tex. App.—Houston [1st Dist.] 2000, no pet.).

The Trustee does not challenge the property rights Arroyo Hondo received. Instead, the Trustee notes that the proceeds from the Arroyo Hondo sales to the Lebowitz Entities went straight to MHI, not to Arroyo Hondo. According to the Trustee, MHI must have had *direct* control of the properties since it received the sale proceeds. But Silverman testified that Arroyo Hondo may have owed MHI those funds,[166] thus suggesting that Arroyo Hondo may have directed the proceeds to MHI to repay that debt. The Trustee's evidence is not strong enough to show direct control and is not sufficient to overcome Arroyo Hondo's record title and the parties' stipulation in the Second Amended Joint Pre-Trial Order that Arroyo Hondo was the original purchaser of the properties.

The Trustee also suggests that *indirect* control of the properties through the Debtor's sole ownership stake in Arroyo Hondo is sufficient to make the Debtor the "true" owner of the Arroyo Hondo properties. In support, the Trustee points to *In re Pace*,[167] where the court found that a chapter 7 trustee could avoid the fraudulent transfer of a condominium by the debtor's wholly owned LLC. But three years prior to that published decision, the *Pace* trustee had obtained a default judgment against the subsidiary on veil-piercing grounds, expressly permitting the trustee to administer the subsidiary's assets for the benefit of the debtor's creditors.[168] The Trustee here, in contrast, has not joined Arroyo Hondo as a defendant for veil-piercing claims or for a declaration that the Debtor—and not Arroyo Hondo—owned the properties transferred by Arroyo Hondo.

As the Supreme Court noted, "[a] basic tenet of American corporate law is that the corporation and its shareholders are distinct entities," and "[a]n individual shareholder, by virtue of his ownership shares, does not own the corporation's assets . . . ."[169] When the corporate fiction is abused, Texas law provides an equitable remedy through corporate

---

[166] Transcript of Hearing Held 8/13/24 [Docket No. 202] at 96:21–97:1.

[167] *Osherow v. Nelson Hensley & Consol. Fund Mgmt. (In re Pace)*, 456 B.R. 253 (Bankr. W.D. Tex. 2011).

[168] *See Osherow v. Chaparral Resources*, Adv. No. 07-5121 (Bankr. W.D. Tex. 2007), Doc. Nos. 1 (complaint), 10 (default judgment). The *Pace* discussion of "control" over the condo after the transfer—for the badges-of-fraud analysis—compared control by the debtor and its subsidiary, on the one hand, versus the control by the transferee, on the other hand.

[169] *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474–75 (2003).

veil-piercing.[170] The Trustee does not allege any veil-piercing theory and instead relies on *IFS* to argue that such theory is not necessary where the debtor is the "true" owner. But in *IFS*, the court did not have to dispense with the corporate structure to find that the debtor was the true owner of the bank accounts. The debtor directly controlled the accounts. Here, finding that MHI is the true owner of Arroyo Hondo's properties because of MHI's ownership stake in Arroyo Hondo would require the Court to ignore the principle that shareholders of a corporation don't own the corporation's assets. In essence, the Trustee invites the Court to pierce the corporate veil without piercing the corporate veil. The Court declines and finds that MHI did not have an interest in the properties sold by Arroyo Hondo to the Lebowitz Entities,[171] so the Trustee may not avoid the transfers of Arroyo Hondo's properties under section 544(b).[172]

### 2. The transfers are not avoidable as actual fraudulent transfers under TUFTA section 24.005(a)(1).

Nor does the Trustee prevail on his section 544(b) claim on the theory that the transfers to the Lebowitz Entities are avoidable as actual fraudulent transfers under TUFTA section 24.005(a)(1). That statute provides:

---

[170] *See, e.g.*, *Bale v. Ryan (In re Ryan)*, 443 B.R. 395, 405 (Bankr. N.D. Tex. 2010); *Tryco Enters. v. Robinson*, 390 S.W.3d 497, 508 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd).

[171] At closing argument, the Trustee argued he can prevail even if Arroyo Hondo owned the properties because the properties were traceable proceeds from the cash that Maple Heights fraudulently transferred to Arroyo Hondo. Plaintiff's Response to Lebowitz Defendants' Motion for Judgment on Partial Findings [Docket No. 241] at 10–13; *see also* Plaintiff's Closing Argument PowerPoint Demonstrative [Docket No. 258-1] at 129 ("Maple Heights' transfer of funds to Arroyo Hondo, which uses the funds to acquire real property, is a classic fraudulent transfer."). Under this theory, the broad scope of TUFTA would give an MHI creditor the ability to recover the proceeds of MHI's fraudulently transferred cash. The problem with this theory is that the Trustee raised it too late in the game. The only fraudulent transfers identified in the Complaint and in the Second Amended Joint Pre-Trial Order were the transfers of the properties themselves. The Court will not entertain the Trustee's new theory.

[172] Even if Maple Heights did have an interest in the Arroyo Hondo properties, the Trustee's avoidance claims still would fail for the independent grounds explained below. Therefore, the balance of this document assumes for argument's sake that Maple Heights did have an interest in Arroyo Hondo's properties for section 544(b) purposes.

> A transfer made . . . by a debtor is fraudulent as to a cred-
> itor, whether the creditor's claim arose before or within a
> reasonable time after the transfer was made . . . , if the
> debtor made the transfer . . . : (1) with actual intent to hin-
> der, delay, or defraud any creditor of the debtor[.][173]

Even if the elements of an actual fraudulent transfer are present, TUFTA section 24.009(a) provides an affirmative defense to transferees who "took in good faith and for a reasonably equivalent value."[174]

The Court agrees with the Lebowitz Defendants that Maple Heights did not make the 2017 and 2018 transfers with the intent to hinder, delay, or defraud its creditors. The Court also agrees with the Lebowitz Defendants that they have established their good-faith defense even if Maple Heights did have the requisite fraudulent intent.

### a. Maple Heights did not intend to hinder, delay, or defraud its creditors.

Whether MHI made the 2017 or 2018 transfers with the intent to hinder, delay, or defraud its creditors is a question of fact that the Trustee bears the burden to prove.[175] Because direct proof of the debtor's state of mind is rarely available, fraudulent intent typically is proven by reference to the circumstantial badges of fraud.[176] TUFTA provides a nonexclusive list of eleven badges of fraud:

> (1) The transfer was to an insider;

> (2) the debtor retained possession or control of the property after the transfer;

> (3) the transfer was concealed;

---

[173] Tex. Bus. & Com. Code § 24.005(a)(1).

[174] Tex. Bus. & Com. Code § 24.009(a).

[175] *Walker v. Anderson*, 232 S.W.3d 899, 914 (Tex. App.—Dallas 2007, no pet.) ("Ordinarily, whether the transfer was made with the actual intent to defraud creditors is a fact question."); *Ingalls v. SMTC Corp. (In re SMTC Mfg. of Tex.)*, 421 B.R. 251, 299 (Bankr. W.D. Tex. 2009).

[176] *Cohen v. Gilmore (In re Ala. & Dunlavy, Ltd.)*, 983 F.3d 766, 775 (5th Cir. 2020).

(4) before the transfer was made, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all of the debtor's assets;

(6) the debtor removed or concealed assets;

(7) the debtor absconded;

(8) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made;

(10) the transfer occurred shortly before or shortly after substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[177]

Generally, when a plaintiff relies on the badges of fraud to prove actual intent, the strength of its case improves if it proves more badges.[178] There is no magic number, however, and the court must consider the badges of fraud in light of all relevant factors and the totality of the circumstances.[179] As *Collier* states it: "The matter is always factual—the

---

[177] TEX. BUS. & COM. CODE § 24.005(b)(1)–(11).

[178] *See, e.g.*, *Kalkan v. Salamanca*, 672 S.W.3d 725, 731 (Tex. App.—Houston [14th Dist.] 2023, no pet.) ("Evidence of a single 'badge of fraud' does not conclusively demonstrate intent, but a confluence of several presents a strong case of fraud.").

[179] *See, e.g.*, *Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 567 B.R. 715, 741 (Bankr. S.D. Tex. 2017) ("Courts and juries must consider all the factors and the 'totality' of the circumstance."); *Halperin v. Neuman Found., Inc. (In re Senior Care Ctrs.)*, 2023 WL 6519756, at *21 (Bankr. N.D. Tex. March 24, 2023) ("Courts in Texas have struggled somewhat regarding just how many badges of fraud must exist to establish actual intent, although generally two or three badges of fraud is regarded as insufficient. Courts 'must consider all the factors and the "totality" of the circumstances.'" (quoting *Tow v. Speer*, 2015 WL 1058080, at *11 (S.D. Tex. Mar. 10, 2015) (footnotes omitted)).

presence of badges of fraud permits but does not compel a finding of actual intent."[180]

***Badgered Badges.*** The Trustee expects a lot of work from the badges, but they don't lift the heavy load needed to prove fraudulent intent under these facts.

> ### i.   *The transfer was to an insider.*

There is no evidence of this badge.

> ### ii.   *The debtor retained possession or control of the properties after the transfer.*

As a part of the 2017 sales, Marietta and EUS80 leased the properties back to MHI's wholly owned subsidiary, Playa Plata, giving it the right to possess the properties as well as pursue entitlements, rezoning, and other requirements needed for the ultimate development of the properties.[181] A virtually identical lease was executed in favor of Playa Plata following the 2018 transfers.[182] It is therefore true that MHI retained indirect possession and some control of the properties through the leases to Playa Plata, but the badge carries less weight under the facts of this case. Evidence at trial showed that the transfers to the Lebowitz Entities in 2017 and 2018 were designed to provide MHI with much needed cash without abandoning the project as a whole.[183] Essential to that design were the leasebacks, which allowed the MHI group to continue making progress on the project until it could find refinancing to exercise the purchase options.[184] Put simply, the leases had a legitimate business

---

[180] 5 COLLIER ON BANKRUPTCY § 548.04[1][b][ii] (16th ed. 2024). Though this comment addresses Bankruptcy Code section 548(a)(1), "UFTA is modeled on § 548(a)(1) of the Bankruptcy Code, and, therefore, cases interpreting § 548(a)(1) may be used to interpret UFTA or its Texas equivalent." *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 194 (5th Cir. 2013); *see also In re 1701 Com., LLC*, 511 B.R. 812, 836 n.198 (Bankr. N.D. Tex. 2014) ("Section 24.005(a)(1) and section 548(a)(1)(A) of the Code adopt similar standards for establishing an actual intent to hinder, delay, or defraud, so decisions under section 548(a)(1)(A) may therefore be considered when determining decisions under section 24.005(a)(1).").

[181] Trustee Ex. 142.

[182] Trustee Ex. 78.

[183] Transcript of Hearing Held 8/6/24 [Docket No. 166] at 52:3–13, 54:23–55:2; Transcript of Hearing Held 8/13/24 [Docket No. 200] at 54:12–20.

[184] Trustee Exs. 78, 142.

purpose. Moreover, this badge typically receives greater weight when a debtor transfers title to property but remains able to use or enjoy the benefits of owning it.[185] The circumstances here are not so simple. The properties sold by MHI in 2017 and 2018 were mostly bare lots.[186] Their value to MHI lay in the rights to sell or develop them, but the leases didn't allow Playa Plata to do either unconditionally. Rather, the leases prohibited Playa Plata from making any permanent alterations to the properties without the permission and approval of the Lebowitz Entities.[187] Thus the leases—which lasted only two years at most—were not intended to be vehicles through which the MHI group could unilaterally bring its project to the finish line. To do that, MHI's subsidiary Playa Plata would have had to repurchase the properties.

### iii.    The transfer was concealed.

A transfer is concealed when it is hidden or kept from being discovered.[188] The concern with concealed transfers is rooted in the idea that secrecy is inherently shady and that transactions done for nonfraudulent purposes should not happen behind closed doors.[189] Commonly, concealment is found as a badge of fraud where the transferee does not record its interest and the debtor acts as if the interest were never transferred,[190] or where the debtor fails to disclose the transaction to creditors

---

[185] *In re Pace*, 456 B.R. at 267 (fraudulent intent found where the debtor sold a condo but continued to control the management of the condo and collect the rents); *Allen v. Massey*, 84 U.S. 351, 353–54 (1872) (transfer was fraudulent and void against the debtor's creditor where the debtor sold to his housemate certain furniture, which remained in the same condition and was used by both the debtor and housemate in the same manner as before the sale); *Nwokedi*, 428 S.W.3d at 206 (fraudulent intent found where debtor transferred funds to an account on which the debtor was a signatory).

[186] Second Amended Joint Pre-Trial Order [Docket No. 209] ¶¶ 44–50.

[187] Trustee Ex. 142.

[188] *Trustmark Nat'l Bank v. Tegeler (In re Tegeler)*, 586 B.R. 598, 677 (Bankr. S.D. Tex. 2018).

[189] *See Twyne's Case*, 76 Eng. Rep. 809, 814 (K.B. 1601) (explaining that if the purpose of a transfer of property is to satisfy a debt, then it should be "made in a public manner, and before the neighbours, and not in private, for secrecy is a mark of fraud.").

[190] *See, e.g.*, *Walton v. First Nat. Bank*, 22 P. 440, (Colo. 1889) (concealment found where transferee secretly held a security in the debtor's property, which enabled the debtor to appear in better financial condition); *Tow v. Pajooh (In re CRCGP, LLC)*, 2008 WL 4107490, at *19 (Bankr. S.D. Tex. Aug. 28, 2008) (concealment found during

when it is under a duty to do so.[191] But a debtor's mere failure to volunteer information to its creditors does not constitute concealment.[192]

All five special warranty deeds conveying MHI's properties to the Lebowitz Entities were recorded in Dallas County within days of their respective closings.[193] Memoranda of both leases to Playa Plata were also recorded.[194] Nonetheless, the Trustee contends that the transfers were concealed because Silverman didn't notify Bistum or Madaus Capital Partners of the sales to the Lebowitz Entities. That argument is unconvincing.

Under the Standstill Agreement, which expired at the end of October 2017, MHI was required to update Bistum on refinancing efforts.[195] MHI signed the sale contract with the Lebowitz Entities on October 18, 2017. Did MHI withhold that information, or did it notify Bistum of the pending sale? Silverman testified that he himself didn't notify Bistum before the 2017 transfers, but nobody from Bistum testified at trial on that point (live in the courtroom, via Webex video,[196] or through deposition testimony). And what about Landwehr? Silverman testified that he

---

the period of time between the delivery and recording of deeds, during which the debtor continued to "hold itself out as controlling the properties"); *Fitzgibbons v. Thomason (In re Thomason)*, 202 B.R. 768, 772 (Bankr. D. Colo. 1996) (transfer of debtor's partnership interest was concealed because the assignment was not recorded and the debtor continued to represent that he was the owner of the interest); *see also W.T. Rawleigh Co. v. Burnette*, 44 So.2d 585, 587 (Ala. 1950) (concealment not found despite the transferee's failure to record the deed because the transferee built a home on the property and lived there with his family).

[191] *See, e.g.*, *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1354 (8th Cir. 1995) (concealment found where debtors omitted the transfers from their bankruptcy schedules, despite the fact that the transfers were recorded); *Ag Venture Fin. Servs. v. Montagne (In re Montagne)*, 417 B.R. 232, 244 (Bankr. D. Vt. 2009) (concealment found where debtor failed to notify its creditor in advance of the transfer as required by the loan documents).

[192] *Cont'l Bank & Tr. Co. of N.Y. v. Winter*, 153 F.2d 397, 399 (2d Cir. 1946); *In re Shoesmith*, 135 F. 684, 687 (7th Cir. 1905).

[193] Lebowitz Exs. 34–39.

[194] Lebowitz Exs. 75, 76.

[195] Trustee Ex. 98.

[196] The Court would have had no issue approving remote testimony from Germany via Webex had somebody requested and arranged for it.

relied on Landwehr to communicate with the German creditors,[197] making Landwehr the most likely candidate to have told Bistum. The Trustee's counsel in this proceeding also represents Landwehr, presumably making him easier to access had either the Trustee or the Lebowitz Defendants attempted to secure his testimony by agreement via Webex. Unfortunately, Landwehr didn't testify, leaving a cloud over this issue. The Trustee has failed to persuade the Court that MHI concealed the transfers from Bistum.

The Trustee also argues that MHI concealed the transfers because it didn't notify Madaus, but MHI didn't owe a duty of disclosure to Madaus Capital Partners or its agents, including Veit Madaus. Any failure to notify them was thus a mere failure to volunteer information. Still, even if Madaus was entitled to know about the sales, it appears they did. First, Madaus received a placement fee from the proceeds of the 2017 sales, strongly suggesting it knew what was happening. Second, emails between Silverman, Tetzner, and Veit Madaus in September 2019 show frustration and potential surprise by Madaus over the terms and performance of the repurchase options and extensions,[198] but that frustration presupposes knowledge of the transfers. Finally, the Trustee unjustifiably sees concealment in a March 2018 letter in which Silverman's attorneys told Madaus they would provide information wanted for Landwehr's criminal proceeding only if—among other conditions—Landwehr and FIB Texas Co. would resign as managers.[199] That letter shows not so much an effort to conceal, but instead an effort by Maple Heights to disentangle itself from Landwehr's criminal problems that were affecting its business.

Finally, the Trustee asserts that MHI concealed the transfers because it did not mention the sales or purchase options in an August 1, 2018 project report, which stated, "The entitlement process is anticipated to take through June, 2019. Thereafter, the preconstruction period should allow commencement of construction in mid-2020."[200] This report is not enough to show concealment. First, it is unclear from the record whether

---

[197] *See, e.g.*, Transcript of Hearing Held 8/6/24 [Docket No. 164] at 39:3–19; Transcript of Hearing Held 8/5/24 [Docket No. 160] at 44:5–10, 55:1–2, 129:8–9, 71:10–14.

[198] Trustee Ex. 45.

[199] Trustee Ex. 168.

[200] Trustee Ex. 34.

any creditor was sent or received this report.[201] Even if a creditor did receive the report, the creditor would be misled only if the creditor were not already aware that the MHI group was continuing to make progress on the project during the purchase-option period. The evidence suggests that the creditors who were entitled to such information were aware of the transfers.

### iv.    The debtor was sued or threatened with suit.

This badge is present. Before the 2017 transfers, MHI was in default on its obligation to Bistum. In the Standstill Agreement signed August 14, 2017, Bistum agreed "not to institute civil litigation for repayment of the Loan for a period of seventy-five days."[202] If MHI defaulted on its reporting obligation during the period of the agreement, Bistum "shall immediately be entitled to . . . institute litigation for repayment of the Loan and all related claims."[203] MHI was under the threat of a lawsuit by Bistum when it made the 2017 and 2018 transfers.

### v.    The transfer was substantially all of the debtor's assets.

MHI's balance sheets from December 2017 and June 2019 indicate that, apart from a relatively small amount of cash and other assets, MHI's assets mainly consisted of the real properties it owned.[204] Whether the Court accepts the property valuation of the Trustee's expert or that of the Lebowitz Defendants' expert, MHI transferred more than three quarters of the value of those properties in the 2017 transfers.[205] A

---

[201] *See, e.g.*, Transcript of Hearing Held 8/5/24 [Docket No. 160] at 117:9–25, 118:1–4, 119:8–11.

[202] Trustee Ex. 98.

[203] *Id.*

[204] Lebowitz Exs. 104, 105.

[205] *See* Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 13, Ex. A; Trustee Ex. 174; Lebowitz Ex. 48. At the time of the 2017 transfers, MHI and Arroyo Hondo owned a total of 378,306 square feet of property. Under the Trustee's valuation, the total value of the property at that time was approximately $39,475,000; under the Lebowitz Defendants' valuation, the value was $16,661,000. The property sold in the 2017 transfer totaled 288,876 square feet. Under the Trustee's valuation, that would have totaled about $30,327,000, or about 77 percent of the value of all the property owned by MHI at the time of the transfers. Under the Lebowitz Defendants' valuation, the 2017 property totaled around $13,314,000, about 81 percent of all the property owned by MHI at that time.

transfer of that magnitude is typically more than sufficient to support a finding that this badge is present.[206] Furthermore, MHI transferred its remaining four properties in the 2018 transfers. Thus, the Court finds that both the 2017 and 2018 transfers were transfers of substantially all the Debtor's assets. Once again, however, the Court gives this badge less weight given the structure of this transaction. Refinancing is an ordinary part of the real-estate development and investment business. Developers or investors sometimes do so using a sale-leaseback with an option to repurchase—a structure akin to a mortgage, but riskier to the borrower. When it transferred the properties, MHI believed the project could be saved; it just needed more money.[207] Thus, it is more likely that MHI sold substantially all of its properties to the Lebowitz Entities in a refinancing effort to save the project rather than to hinder, delay, or defraud its creditors. Simply because MHI made a risky decision that might negatively affect its creditors does not mean it did so for that purpose. Moreover, as the Court will discuss in detail later, MHI received reasonably equivalent value for the properties.

*vi.    The debtor removed or concealed assets.*

The Trustee contends that MHI concealed assets because it wired the 2017 sales proceeds to Playa Plata while hiding Playa Plata's existence from MHI's creditors.[208] As noted earlier, concealment involves the act of hiding something or keeping it from being discovered. Certainly, the element of concealment would be met if MHI moved assets into a subsidiary that it was hiding from its creditors, but the Trustee didn't prove that. The only evidence the Trustee points to for this claim is Playa Plata's Texas Franchise Tax Public Information Report.[209] In that report, Section C requires the filing entity to report any corporation or

---

[206] *See Sherman v. OTA Franchise Corp. (In re Essential Fin. Educ., Inc.)*, 629 B.R. 401, 438 (Bankr. N.D. Tex. 2021) (finding that a transfer of 77 percent of the debtor's assets was a transfer of substantially all of the debtor's assets); *In re Sissom*, 366 B.R. 677, 697 n.30 (Bankr. S.D. Tex. 2007) (finding that a transfer of 70 to 75 percent of the debtor's assets was substantially all of the debtor's assets).

[207] Transcript of Hearing Held 8/13/24 [Docket No. 200] at 38:15–24; Transcript of Hearing Held 8/13/24 [Docket No. 204] at 14:2–15:5.

[208] Transcript of Hearing Held 8/30/24 [Docket No. 262] at 20:13–21:15. The Trustee has not raised the disposition of the 2018 sales proceeds as a badge of fraud.

[209] Trustee Ex. 172.

32

LLC that owns ten percent or more of the filing entity.[210] Playa Plata left that section blank despite being wholly owned by MHI.[211] This evidence is not enough on its own to justify a concealment finding. The body of evidence at trial indicated that Silverman was generally unorganized and inattentive to detail when it came to running his businesses.[212] Sloppiness in filling out the form is equally likely to explain the omission on the public information report absent additional evidence that MHI was actively keeping its creditors from discovering Playa Plata.

Though MHI did not conceal assets, it did remove them. A finding that a debtor removed assets from the estate is sufficient to establish this badge even without a finding of concealment.[213] Here, shortly after the 2017 sale, MHI wired $4 million from its bank account to Playa Plata.[214] Playa Plata, however, was not a random affiliate of MHI. Rather, Playa Plata—MHI's wholly owned subsidiary—was a major piece in MHI's strategy to complete the project. Specifically, Playa Plata owned the leases and purchase options. Silverman testified that this formation was intended to attract potential new lenders or equity partners, who would have required the project to proceed in the hands of a single-purpose entity apart from MHI.[215] Thus, a transfer of assets to Playa Plata by MHI appears more in line with a legitimate downstream capital infusion rather than an attempt to hinder, delay, or defraud MHI's creditors. Once again, although this badge is present, the Court gives it little weight under the specific facts of this case.

*vii.*     *The debtor absconded.*

There is no evidence of this badge.

---

[210] *Id.*

[211] *Id.*

[212] *See, e.g.*, Transcript of Hearing Held 8/7/24 [Docket No. 170] at 46:4–47:17.

[213] *See In re Ritz*, 567 B.R. at 749.

[214] Transcript of Hearing Held 8/5/24 [Docket No. 160] at 59:11–15; Trustee Ex. 157; Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 19.

[215] Trustee Ex. 58; Transcript of Hearing Held 8/6/24 [Docket No. 166] at 55:20–56:17.

> viii. *The value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred.*

This badge is not present. As the Court will discuss later, MHI received reasonably equivalent value for the properties it sold to the Lebowitz Entities in 2017 and 2018.

> ix. *The debtor was insolvent or became insolvent shortly after the transfer was made.*

"A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."[216] A presumption of insolvency arises where the debtor is "generally not paying the debtor's debts as they become due."[217] The Trustee does not press the Court to presume insolvency.[218] Instead, the Trustee argues directly that MHI had debts greater than its assets following both the 2017 and 2018 transfers. The Trustee presented expert testimony from Larry Kanter, who opined that following the 2017 and 2018 transfers, MHI had total debts greater than total assets.[219] The Lebowitz Defendants suggest that Kanter's opinion about the debtor's solvency following the 2017 transfers left out key assets that would have changed the analysis.

Because MHI's potential insolvency does not alter the Court's overall finding regarding the badges of fraud and MHI's intent, the Court will assume, without deciding, that MHI was insolvent when it made the transfers. Evidence of a debtor's insolvency is less important where the transfers were done for a legitimate business purpose.[220] As the Court

---

[216] TEX. BUS. & COM. CODE § 24.003(a).

[217] *Id*. § 24.003(b).

[218] Even if the Trustee had asked the Court to presume insolvency, the answer is far from clear. There was evidence that Bistum—MHI's largest unsecured creditor—was not getting paid prior to the 2017 transfers. Evidence that a single creditor is not getting paid may or may not be sufficient to show that the debtor was generally not paying its debts as they came due. *See, e.g.*, *Janvey v. Dillion Gage, Inc. of Dallas*, 856 F.3d 377, 387–88 (5th Cir. 2017); *In re Iridium Operating LLC*, 373 B.R. 283, 343–44 (Bankr. S.D.N.Y. 2007).

[219] Trustee Ex. 181; Lebowitz Ex. 53; Transcript of Hearing Held 8/9/24 [Docket No. 187] at 76:14–77:2; Transcript of Hearing Held 8/9/24 [Docket No. 186] at 33:17–37:4.

[220] *See Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Grp.)*, 127 B.R. 580, 584 (D. Md. 1991); *Harris Tr. & Sav. Bank v. Keig (In re Prima Co.)*, 98 F.2d 952, 968 (7th Cir. 1938).

already found, the evidence in this case is that MHI made the 2017 and 2018 transfers to try to save the project—a project that both MHI and its investors believed could be profitable. Whether the transfers were prudent business decisions or not, they were business decisions nonetheless. And, once again, the transfers were made for reasonably equivalent value, so MHI's insolvency (or solvency) did not materially change in the transaction. Thus, even assuming MHI was insolvent, or somehow rendered insolvent, when MHI made the transfers, this badge does little to move the needle in the Court's analysis of MHI's intent.

> *x.* *The transfer occurred shortly before or shortly after substantial debt was incurred.*

There is no evidence of this badge.

> *xi.* *The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.*

None of the Lebowitz Defendants were creditors of MHI and thus were not lienors at the time of the transfers. Additionally, the Lebowitz Entities did not transfer to Playa Plata the same assets they received from MHI. Instead, the Lebowitz Entities transferred to Playa Plata only some of the sticks (such as a lease and purchase option) from the bundle it received from MHI. Thus, the facts of this case do not fit neatly within the requirements of this badge.

Even if the Court considered the sale-leasebacks as disguised mortgages, this badge still would not be present. This badge is designed to capture circumstances where the debtor and the debtor's secured creditor act together in a series of transfers to cut out the debtor's unsecured creditors and maintain the status quo between the debtor and his secured creditor. For example, the comments to the Uniform Fraudulent Transfer Act point to *Northern Pacific Co. v. Boyd*[221] as the exemplary case.[222] In that case, the mortgage bondholders and stockholders of a railroad company attempted a reorganization that resulted, through a foreclosure sale, in a new reorganized company with the same owners,

---

[221] 228 U.S. 482 (1913).

[222] Unif. Fraudulent Transfer Act § 4 cmt. 7.

the same secured debts, and none of the unsecured debts.[223] Because the stockholders of the railroad company were also the stockholders of the reorganized company, the effect was the same as if the railroad company had purchased its own assets at the foreclosure sale, which ordinarily cuts off the claims of unsecured creditors.[224] The reorganization effort was unsuccessful: The Court denounced any attempt to secure the subordinate interests of the stockholders at the expense of unsecured creditors.[225] In other words, the reorganization violated the absolute-priority rule.

The facts here are different. At a very broad level, the transfers appear to be a transfer of property to the Lebowitz Entities—the lienors in this exercise—which then transferred the property to Playa Plata—an insider of MHI. Unlike the *Boyd* transfers, however, the transfers in this case did not leave MHI's unsecured creditors in the dust while MHI and Lebowitz reaped the benefits of the project. Playa Plata was wholly owned by MHI. Thus, any value flowing to MHI from Playa Plata was also value to MHI's unsecured creditors. In other words, even though MHI's unsecured creditors became structurally subordinated to Playa Plata's creditors, MHI's unsecured creditors were not simply wiped out; instead, they stood to get paid if the project succeeded. The transfers to Playa Plata appear more in line with MHI's interest in developing and finishing the project for the benefit of all creditors, including unsecured creditors. Accordingly, this badge is not present.

The Court has considered the alleged badges of fraud, finding some present and some absent. The Court has also carefully considered Silverman's credibility at trial, as well as all other evidence of alleged fraudulent intent not specifically addressed so far. Finally, the Court has considered the peculiar and uncomfortable facts—which merely bolster the Court's intent finding and do not alter it—that Landwehr (a) helped plan and support the Maple Heights project, (b) approved and profited significantly from the 2017 sales, yet (c) after the project failed, raised funds from investors to file a lawsuit—using Landwehr's and the Trustee's

---

[223] *Boyd*, 228 U.S. at 488–89.

[224] *Id.* at 502–03.

[225] *Id.* at 503–05.

shared counsel—alleging (in part) that the sales Landwehr blessed and profited from were all fraudulent.[226]

After considering all the evidence, the Court finds that MHI did not intend to hinder, delay, or defraud its creditors when making the 2017 and 2018 transfers.

### b. The Lebowitz Entities took the properties in good faith and for reasonably equivalent value.

Even if MHI had intended to hinder, delay, or defraud its creditors when it made the 2017 and 2018 transfers, the Trustee still would not be able to avoid the transfers. TUFTA provides an affirmative defense against actual-fraudulent-transfer claims to persons "who took in good faith and for a reasonably equivalent value."[227] The burden of proving the defense rests with the party invoking it.[228] As discussed in detail later, the Lebowitz Entities paid reasonably equivalent value for the properties. The remaining question is whether they took the properties in good faith. The Court finds they did, so the Lebowitz Entities have established the good-faith defense provided in TUFTA section 24.009(a).

TUFTA does not define good faith, but Texas courts require that the transferee show that its "conduct was honest in fact, reasonable in light of known facts, and free from willful ignorance of fraud."[229] In determining whether the transferee has met this standard, Texas courts consider whether the transferee took the transfers with actual knowledge or inquiry notice of the fraudulent nature of the transfers.[230] "Inquiry notice is '[n]otice attributed to a person when the information would lead an ordinarily prudent person to investigate the matter further.'"[231] A person is put on inquiry notice when he is aware of red flags—facts that "'excite the suspicions of a person of ordinary prudence' regarding 'the

---

[226] More on this below regarding the alleged breach of the duty of loyalty.

[227] TEX. BUS. & COM. CODE § 24.009(a).

[228] *Flores v. Robinson Roofing & Constr. Co.*, 161 S.W.3d 750, 756 (Tex. App.—Forth Worth 2005, pet. denied).

[229] *Janvey v. GMAG, L.L.C.*, 592 S.W.3d 125, 129 (Tex. 2019).

[230] *Id.*

[231] *Id.* at 130 (quoting BLACK'S LAW DICTIONARY (11th ed. 2019)).

fraudulent nature of an alleged transfer.'"[232] Once on inquiry notice, a transferee is deemed to have constructive knowledge of facts the transferee should have uncovered in an investigation.[233] A transferee on inquiry notice cannot establish good faith, however, if it does not conduct a diligent investigation of the underlying suspicious facts, even if that investigation would not have in fact revealed the fraudulent nature of the transfers.[234]

The Court finds that the Lebowitz Entities did not have actual knowledge or inquiry notice of fraud with respect to the 2017 or 2018 transfers. To the contrary, the evidence in this case shows that the Lebowitz Entities acted reasonably and honestly in dealing with MHI. When Harris approached Lebowitz in 2017, Lebowitz had no reason to question the sincerity of Harris's request or think that MHI was intending to hinder, delay, or defraud its creditors. Lebowitz testified that he was never made aware of the Bistum Standstill Agreement.[235] Harris and Silverman were optimistic and confident about the project when they met with Lebowitz.[236] Because he does not practice in the traditional lending that Harris and Silverman were seeking, Lebowitz offered to purchase the properties and lease them back to MHI with a purchase option as an alternative.[237] Lebowitz testified that he uses this structure often with other developers and that MHI was the first developer that was not able to repurchase the property from him.[238] Lebowitz thoroughly explained how he and MHI arrived at the $45 per square foot price in 2017. Lebowitz reviewed four different appraisals during his due diligence and credibly explained to the Court in detail why he did not give weight to some of the numbers in those appraisals.[239] Moreover,

---

[232] *In re Ala. & Dunlavy, Ltd.*, 983 F.3d at 776 (quoting *Hahn v. Love*, 321 S.W.3d 517, 527 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)).

[233] *GMAG*, 592 S.W.3d at 130.

[234] *Id.* at 131.

[235] Transcript of Hearing Held 8/12/2024 [Docket No. 194] at 40:7–11.

[236] Transcript of Hearing Held 8/13/24 [Docket No. 200] at 38:15–24.

[237] Transcript of Hearing Held 8/12/2024 [Docket No. 194] at 26:12–24.

[238] *Id.* at 26:20–22; Transcript of Hearing Held 8/13/24 [Docket No. 202] at 30:23–31:3, 70:1–10.

[239] Transcript of Hearing Held 8/13/24 [Docket No. 200] at 25:17–23, 26:4–6, 28:8–13, 30:18–31:14, 31:20–38:14; Transcript of Hearing Held 8/13/24 [Docket No. 202] at 56:2–24, 59:18–61:2; *see* Lebowitz Exs. 117–20.

Lebowitz is a real-estate broker with decades of experience dealing in the subject area. He testified that he knew what comparable properties were selling for.[240] He was also aware that MHI had purchased the Sarris and Tung Tracts for less than $45 per square foot the year before.[241] Lebowitz told MHI he thought the properties were worth $40 per square foot, and the two ultimately agreed on $45 per square foot.[242] That process is consistent with the one Lebowitz stated he normally uses when negotiating a purchase price for property.[243] Lebowitz also made sure the price was enough to acquire good title and pay off MHI's existing secured lenders.[244] Based on his experience, Lebowitz credibly believed the option period and extension were a realistic time frame for MHI to acquire the remaining properties and initiate the zoning process.[245]

When Harris returned to Lebowitz in 2018, Lebowitz again had no reason to suspect that MHI was in financial distress or was otherwise dumping assets. In fact, Harris told Lebowitz about an expanded vision for the project and showed him architectural renderings.[246] Harris assured Lebowitz that the expanded project was gaining interest and that MHI might even have an anchor tenant lined up for one of the future office buildings.[247] Furthermore, Lebowitz credibly testified that he was unaware that the 2018 sales involved the remainder of MHI's assets.[248] Nor was he aware of Landwehr's arrest.[249] Lebowitz agreed to purchase the 2018 properties at $30 per square foot for the townhome-zoned property and $45 per square foot for the retail—numbers he arrived at through consideration of comparable sales in the area.[250] Ultimately, the evidence in this case indicates that Lebowitz reasonably believed he was

---

[240] Transcript of Hearing Held 8/13/24 [Docket No. 200] at 42:18–25.

[241] *Id*. at 39:12–24.

[242] *Id*. at 42:25–43:1.

[243] *Id*. at 22:24–23:7.

[244] *Id*. at 56:15–25; Transcript of Hearing Held 8/12/24 [Docket No. 205] at 18:6–14.

[245] Transcript of Hearing Held 8/13/24 [Docket No. 200] at 80:8–15.

[246] Transcript of Hearing Held 8/12/24 [Docket No. 205] at 7:12–8:5.

[247] Transcript of Hearing Held 8/13/24 [Docket No. 204] at 14:20–25.

[248] Transcript of Hearing Held 8/12/24 [Docket No. 205] at 8:8–19, 15:20–21.

[249] Transcript of Hearing Held 8/13/24 [Docket No. 204] at 55:21–56:6.

[250] Lebowitz Ex. 59.

dealing with a legitimate business with reasonable odds of success. He utilized a common transaction structure that gave MHI what it needed at a price carefully negotiated to ensure the Lebowitz Entities would receive good title.

***Flawed Flags.*** The Trustee points to several facts he believes were red flags that put Lebowitz on inquiry notice of MHI's intent to hinder, delay, or defraud its creditors. Those flag allegations are flawed.

First, the Trustee notes that Lebowitz knew MHI was unable to borrow what it needed from a traditional lender. This fact alone, however, is not suspicious. Lebowitz explained at trial that one reason developers like the sale-leaseback structure is that they can obtain more money that way than they can get from a traditional bank lender, which typically will not lend up to the full value of the property.[251] MHI's willingness to deal with Lebowitz merely showed that MHI needed more financing than it could get at a bank. It did not suggest an intent to hinder, delay, or defraud creditors.

Next, the Trustee argues that Lebowitz knew MHI was selling at a loss compared to appraised values and compared to what MHI had purchased the properties for. One of the appraisals Lebowitz used in his due diligence appraised 4435 Maple for $80 per square foot.[252] That number was an outlier, however. The other two Maple fronting properties directly on either side of 4435 were valued in that same appraisal at $45 per square foot.[253] It is hardly suspicious that MHI was willing to part with 4435 for the same price as nearly identical parcels. It is true that, overall, Lebowitz paid less for the properties than MHI did.[254] Lebowitz testified he knew what MHI paid, at least with respect to the Sarris, Tung, and Schultz Tracts.[255] Even assuming Lebowitz, as an experienced real-estate broker, knew what MHI paid for all the properties, the Court is still unconvinced that such knowledge was a red flag.

---

[251] Transcript of Hearing Held 8/13/24 [Docket No. 202] at 28:9–20, 29:19–31:3.

[252] *Id*. at 56:2–9; Lebowitz Ex. 119.

[253] Lebowitz Ex. 119.

[254] *See* Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 13, Ex. A.

[255] Transcript of Hearing Held 8/13/24 [Docket No. 200] at 39:12–24.

First, the Lebowitz Entities actually paid more than MHI did for the Tung and Sarris Tracts.[256] As for the properties Lebowitz paid less for, the Trustee suggests it was a red flag because selling property at a loss is a sign that the seller is trying to dump assets. But it is equally a sign that the seller's property has simply lost value. Lebowitz testified credibly that many of the properties MHI bought had substantially changed by the time the Lebowitz Entities purchased them. Some of the properties MHI bought contained significant improvements capable of earning rental income. Almost all of those improvements were demolished by the time the Lebowitz Entities closed on the properties.[257] Lebowitz testified that those improvements added value and that MHI made a mistake by demolishing them so early on in the project.[258] Moreover, the evidence indicated that MHI's acquisition strategy involved overpaying for some of the properties because it believed the cost would average out when fully assembled.[259] Having to sell some properties at a loss under these circumstances is not suspicious. Rather, it is entirely predictable.

The next "red flag" the Trustee asserts should have put the Lebowitz Entities on inquiry notice was that the earlier version of the 2017 deal had Lebowitz paying approximately $2 million more than he actually paid under the October 2017 Sale Contract. The Trustee suggests that it made no sense for Silverman to accept $2 million less and thus it should have been a red flag to Lebowitz that MHI was fire-selling assets.[260] The Court disagrees. First, the earlier version of the deal and

---

[256] *See* Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 13, Ex. A.

[257] Transcript of Hearing Held 8/13/24 [Docket No. 200] at 76:18–21.

[258] *Id*. at 40:6–41:7, 68:21–69:5, 71:12–19. At trial, the Trustee attempted to prove that Lebowitz thought the improvements had no value by referencing a letter Lebowitz wrote to Silverman in October 2017. In that letter, Lebowitz wrote: "Although several of these properties have some improvements on them, the improvements have no value and in fact detract from the value of the raw land as a potential redevelopment site." Lebowitz Ex. 58. However, by the time Lebowitz wrote this letter, all the income-producing improvements were already demolished. All that remained on the property was a house suspected of having asbestos and other contamination issues, and a gutted strip mall that was intended by MHI to be used for staging. Transcript of Hearing Held 8/13/24 [Docket No. 200] at 66:8–25. Lebowitz obviously was referring to those properties and not the income-producing structures that were demolished. *See id*. at 72:5–19.

[259] Transcript of Hearing Held 8/6/24 [Docket No. 164] at 115:23–116:24; Transcript of Hearing Held 8/19/24 [Docket No. 214] at 66:9–19.

[260] Transcript of Hearing Held 9/3/2024 [Docket No. 274] at 51:22–52:7; Transcript of Hearing Held 9/3/2024 [Docket No. 273] at 114:4–17.

the final deal were different bargains. Although both deals included the Sarris Tract, Shultz Tract, Tung Tract, 4501 and 4507 Maple Avenue, and 4401 Maple Avenue, the final deal excluded 4347 Maple Avenue and included three additional tracts: 2435 Hondo Avenue, 2439 Hondo Avenue, and 4409 Maple Avenue.[261] This required at least some renegotiation between the parties.[262] Second, with respect to the Sarris Tract, Schultz Tract, and Tung Tract, which accounted for 219,645 square feet of the property to be sold in both deals, the price Lebowitz paid in the October 2017 Sale Contract—$45 per square foot—was equal to or more than the fair-market value suggested by Lebowitz's due-diligence materials. Of the four appraisals Lebowitz received in his due diligence: one valued the Sarris and Schultz Tracts at $39.72 per square foot, one valued the Tung Tract at $44 per square foot, and another valued the Sarris Tract at $45 per square foot.[263] The fourth appraisal valued the properties much higher, but was largely disregarded by Lebowitz because it assumed, among other things, that MHI owned properties that it had not yet acquired.[264] A fire sale implies a sale below fair-market value.[265] The Court fails to see why Lebowitz should have been suspicious that MHI was fire-selling its assets by agreeing to a price that was equal to or higher than what three out of four due-diligence appraisals claimed the fair-market value to be. Third, although the Bistum Standstill Agreement was signed after the original contract but before the October 2017 Sale Contract, Lebowitz was not aware of that fact,[266] so there is no reason Lebowitz should have thought the price drop was caused by anything other than ordinary negotiation.

Another alleged "red flag": The Trustee argues that Lebowitz should have been suspicious when MHI asked him to change the tenant on the lease from MHI to Playa Plata. Utilizing subsidiaries in this manner,

---

[261] Trustee Exs. 13, 85; Lebowitz Ex. 83

[262] Transcript of Hearing Held 8/13/24 [Docket No. 200] at 61:17–20, 63:19–64:2.

[263] *Id.* at 25:17–31:24; Lebowitz Exs. 117–19.

[264] Lebowitz Ex. 120; Transcript of Hearing Held 8/13/24 [Docket No. 200] at 33:6–7, 34:22–35:6, 36:17–23, 37:12.

[265] *Fire sale*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defined in subsection under *Sale*) ("Any sale at greatly reduced prices, esp. because of an emergency.").

[266] Transcript of Hearing Held 8/12/2024 [Docket No. 194] at 40:7–11.

however, is not uncommon in the real-estate space.[267] The suspicion, the Trustee argues, arises because Playa Plata was not the designated tenant at the inception of negotiations. Instead, the parties originally understood that MHI would be the tenant. This argument holds no water. The mere act of changing the terms of the lease from one ordinary thing to another ordinary thing during heavy negotiations with other changing deal terms is not suspicious.

The next alleged "red flag": The Trustee argues that the Lebowitz Defendants were on inquiry notice because Lebowitz knew MHI was not netting enough from the sales to exercise the purchase options. But MHI did not sell the property because it needed cash to immediately repurchase the properties. MHI needed cash to pay soon-to-mature loans and to purchase the remaining properties needed to complete the assemblage.[268] For all Lebowitz knew, the 2017 and 2018 transfers achieved both of those goals. There was no reliable indication to Lebowitz before any of the transfers that MHI and Playa Plata would not otherwise be able to come up with the additional funds needed to exercise the options if they decided to do so.[269]

The final alleged "red flag": The 2017 and 2018 leases each contained a term providing for a default if Playa Plata or any guarantor makes a fraudulent transfer.[270] According to the Trustee, Lebowitz negotiated this provision to protect himself from fraudulent-transfer liability because he was aware MHI was in financial distress at the time of the transfers.[271] Lebowitz, however, testified credibly that he did not negotiate that term of the lease, which instead was a form lease he copied

---

[267] *Id*. at 68:22–69:23.

[268] Transcript of Hearing Held 8/13/24 [Docket No. 200] at 50:20–22; Transcript of Hearing Held 8/6/24 [Docket No. 166] at 49:18–21.

[269] Transcript of Hearing Held 8/12/2024 [Docket No. 194] at 27:17–29:21; Transcript of Hearing Held 8/12/24 [Docket No. 205] at 46:6–12; Transcript of Hearing Held 8/13/2024 [Docket No. 202] at 70:1–14.

[270] Lebowitz Ex. 95 at 5 (providing that the tenant defaults under the lease if the "Tenant or any guarantor of Tenant's obligations under this lease shall become insolvent, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors"); Lebowitz Ex. 96 at 5 (same).

[271] Transcript of Hearing Held 9/3/2024 [Docket No. 274] at 53:6–18; Transcript of Hearing Held 9/3/2024 [Docket No. 273] at 110:14–23.

from a third party.[272] In other words, the term was merely a boilerplate fraudulent-transfer clause—one that is common in real-estate contracts and in just about every other contract the Court has ever seen. Still, the Trustee argues the fraudulent-transfer-default provision must have been top-of-mind for Lebowitz since he summarized that provision in an October 2019 memo that summarizes the key provisions of the 2018 lease.[273] Thus, according to the Trustee, the fraudulent-transfer-default provision was a crucial element of Lebowitz's bargain rather than mere boilerplate language.[274] Lebowitz testified credibly that he simply wanted to have something summarizing the terms that he could refer to without having to go back through the lease.[275] This memo is not enough to establish that the fraudulent-transfer-default provision was particularly important to Lebowitz. Though not every term of the lease was included in the memo, it mentioned *every* term governing default by the tenant—a critical element of any lease.[276] The inclusion of the fraudulent-transfer clause in the memo appears to have been a product of Lebowitz's concern over the terms of defaults generally rather than a product of a particular concern about fraudulent transfers.[277]

The Court finds that the fraudulent-transfer-default provisions in the 2017 and 2018 leases are not suspicious red flags that put Lebowitz on inquiry notice, nor are they evidence that Lebowitz actually knew MHI had an intent to hinder, delay, or defraud its creditors. This flag is much ado about nothing.

For the foregoing reasons, the Court finds that the Lebowitz Entities were good-faith purchasers for reasonably equivalent value and have

---

[272] Transcript of Hearing Held 8/13/2024 [Docket No. 202] at 36:17–23.

[273] *See* Lebowitz Ex. 70.

[274] Transcript of Hearing Held 9/3/2024 [Docket No. 274] at 53:6–18.

[275] Transcript of Hearing Held 8/13/2024 [Docket No. 202] at 38:12–17.

[276] *See* Lebowitz Ex. 70 at 2.

[277] Note that the fraudulent-transfer clause doesn't even help Lebowitz here. The clause applies to Playa Plata and any guarantor of the leases. The Trustee admitted there is no evidence MHI guaranteed either of the leases. Transcript of Hearing Held 8/12/2024 [Docket No. 194] at 77:21–22. The fraudulent-transfer provision offers no protection whatsoever to Lebowitz for fraudulent transfers by MHI—which are the sort alleged in this case.

therefore established the affirmative good-faith defense provided in TUFTA section 24.009(a).

### 3. The transfers of property are not avoidable as constructive fraudulent transfers under TUFTA section 24.005(a)(2) or 24.006(a) because Maple Heights received reasonably equivalent value.

The Trustee likewise fails to prevail under his constructive-fraudulent-transfer claim. Under TUFTA, constructive fraudulent transfers are those made by a debtor in exchange for less than "reasonably equivalent value" when the debtor was, at the time of or as a result of the transfer, either: (1) insolvent, (2) unable to pay its debts as they became due, or (3) left with unreasonably small capital for the debtor's business.[278] Whether MHI received reasonably equivalent value in the 2017 and 2018 transfers was perhaps the most contested issue at trial because that issue is part of the badges-of-fraud analysis for the actual-fraudulent-transfer claim, and it is also an essential element to both the constructive-fraudulent-transfer claim and the good-faith-purchaser defense. Accordingly, a myriad of experts testified on both sides of the issue.

For reasons detailed below, the Court finds that MHI received reasonably equivalent value in the 2017 and 2018 transfers.[279] Because that finding is fatal to the Trustee's fraudulent-transfer claim, the Court does not reach the insolvency elements under either section 24.005(a)(2) or section 24.006(a).

TUFTA is unique among the fraudulent-transfer laws because it provides a nonexclusive, market-value-based definition of "reasonably

---

[278] TEX. BUS. & COM. CODE §§ 24.005(a)(2), 24.006(a); *Weiss v. Arabella Expl., Inc. (In re Arabella Petroleum Co.)*, 647 B.R. 851, 869 (Bankr. W.D. Tex. 2022). In short, the essential elements of a TUFTA constructive-fraudulent-transfer claim are that the transfer was made: (1) without receiving reasonably equivalent value, and (2) while the debtor was insolvent, or resulted in the debtor becoming insolvent. *See In re Essential Fin. Educ., Inc.*, 629 B.R. at 442 n.267 (explaining that the elements requiring financial difficulties in sections 24.005(a)(2) and 24.006(a) are essentially the balance sheet and income statement tests for insolvency).

[279] The Court has already determined that MHI did not have a property interest in the properties transferred by Arroyo Hondo. This part of the ruling assumes that MHI owned all the properties and thus provides an independent ground for why the Arroyo Hondo transfers are not avoidable.

equivalent value."[280] Under TUFTA, "reasonably equivalent value" in-
cludes, without limitation, a transfer or obligation that falls within the
range of values for which the transferor would have sold the property in
an arm's-length transaction.[281] Whether the debtor received reasonably
equivalent value for the transfer of property is determined from a rea-
sonable creditor's perspective and at the time of the transaction, rather
than in hindsight.[282] The value received is not "reasonably equivalent"
if, from that perspective, the transaction's net economic effect dissipates
the debtor's estate and, in turn, the funds available to the unsecured
creditors.[283] But the debtor is not required to receive an exact dol-
lar-for-dollar value to satisfy the requirement.[284] The fair-market value
of what the debtor gave and received must be measured objectively and
without consideration of the subjective needs or perspectives of either
the debtor or the transferee.[285] Courts will examine all circumstances
surrounding the transaction to determine whether the value given and
received is reasonable and proportional.[286]

***Value Variations.*** The parties assert exceptionally disparate values
for the properties. The Lebowitz Entities purchased them for
$17,218,060 ($41.45 per square foot).[287] The Lebowitz Defendants argue
that the properties had a fair-market value of $17,545,000 ($42.34 per
square foot) at the time of the transfers[288] and that the purchase options
and the leases to Playa Plata that contained the options supplement the

---

[280] *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 573 (Tex. 2016).

[281] Tex. Bus. & Com. Code § 24.004(d).

[282] *Golf Channel*, 487 S.W.3d at 569, 582.

[283] *Wyly v. Wyly (In re Wyly)*, 607 B.R. 862, 873 (Bankr. N.D. Tex. 2018); *In re Ritz*, 567
B.R. at 745.

[284] *In re Wyly*, 607 B.R. at 873.

[285] *In re Ritz*, 567 B.R. at 745–46; *Golf Channel*, 487 S.W.3d at 574 ("While the defini-
tions of 'value' and 'reasonably equivalent value' are expansive and nonexclusive, there
is nevertheless an implicit requirement that the transfer confer some direct or indirect
economic benefit to the debtor, as opposed to . . . transactions that merely hold subjec-
tive value to the debtor or transferee." (footnotes omitted)).

[286] *In re Pace*, 456 B.R. at 270 (citing *Smith v. Am. Founders Fin. Corp.*, 2006 WL
2844251, at *9–10 (S.D. Tex. Sept. 29, 2006)).

[287] *See* Second Amended Pre-Trial Order [Docket No. 209] ¶¶ 14–17, 22–27.

[288] Lebowitz Ex. 48 at 7; *See* Transcript of Hearing Held 8/21/24 [Docket No. 228] at
50:3–21.

value received by MHI.[289] The Trustee, in contrast, argues that the properties had a fair-market value of $43.82 million ($105.52 per square foot) at the time of the transfers[290] and that the purchase options and leases had no value to MHI.[291]

The Court finds that the properties had a fair-market value of $17,545,000 ($13,315,000 for the properties sold in 2017 and $4.23 million for the properties sold in 2018) and that the sale proceeds alone (whether considered part of one sale or several individual sales) provided MHI reasonably equivalent value for the properties. Whatever value the options and leases had simply buttressed that reasonably equivalent value.

### a. The CBRE Report and Matt Browne's opinion of value are not credible.

The Trustee designated Matt Browne, a Texas certified real-estate appraiser, as his expert to opine on the properties' fair-market value.[292] Browne prepared an appraisal report while he was employed at CBRE, Inc. (the "**CBRE Report**")[293] valuing the properties at $43.82 million ($105.52 per square foot) at the time of the transfers.[294]

The CBRE Report employed the sales-comparison approach to valuation, which utilizes sales of comparable properties, adjusted for differences, to indicate a value for the subject. Browne valued the properties as five separate and assembled tracts shown on this map:[295]

---

[289] Lebowitz Ex. 131 ¶¶ 18–30; *See* Transcript of Hearing Held 8/26/24 [Docket No. 242] at 27:3–11.

[290] *See* Trustee Ex. 174 at iv–v; Transcript of Hearing Held 8/7/24 [Docket No. 171] at 27:18–23.

[291] Lebowitz Ex. 197 ¶¶ 18–41; *See* Transcript of Hearing Held 8/8/24 [Docket No. 178] at 52:6–13.

[292] *See* Plaintiff Daniel J. Sherman's Second Amended Witness and Exhibit Lists and Deposition Designations [Docket No. 147] at 5.

[293] Kristen Cahill of CBRE also helped prepare the report. Trustee Ex. 174 at i.

[294] *See id.* at iv–v; Transcript of Hearing Held 8/7/24 [Docket No. 171] at 27:18–23.

[295] Transcript of Hearing Held 8/7/24 [Docket No. 170] at 71:6–12; Trustee Ex. 174 at ii.



- Tract One, Retail (circumscribed in purple on the map) was created by Browne by combining twenty smaller, retail-zoned tracts, many of which are contiguous but some of which have two third-party-owned tracts squeezed between them (circumscribed in light blue, including a lot with a gas station).

- Tract Two, Retail (circumscribed in dark blue on the map) was created by Browne by combining two smaller, noncontiguous lots fronting Maple Avenue, with a third-party-owned lot (light blue) between them.

- Tract One, Townhome/Multi-Family (circumscribed in yellow on the map) was created by Browne by combining 13 smaller townhome/multi-family-zoned tracts, some of which are contiguous but with eight third-party-owned lots interspersed among them (light blue).

- Tract Two, Townhome/Multi-Family (circumscribed in pink) was created by Browne by combining two contiguous townhome/multi-family-zoned tracts.

- Tract Three, Townhome/Multi-Family (circumscribed in red) was not created by combining smaller lots. MHI purchased that

48

lot—also known as the "Tung Tract"—with an apartment complex on it, then sold it as a bare lot to EUS80 after razing the apartments. Browne valued it as a standalone lot.

For each of these Tracts, Browne identified three comparable land sales and made value adjustments to each comp (to adjust for size, shape, location, and other value-altering characteristics) to reach a comp price per square foot that, when multiplied by the subject Tract's total square feet, produced a value for the subject Tract. Browne then selected the "best" comp (the one requiring the smallest absolute adjustment) to determine each Tract's value. Finally, Browne tallied each Tract's value to reach his combined value:

| | |
|---|---|
| Tract One, Retail | $19,750,000 |
| Tract Two, Retail | $2,250,000 |
| Tract One, Townhome/Multi-Family | $11,250,000 |
| Tract Two, Townhome/Multi-Family | $1,770,000 |
| Tract Three, Townhome/Multi-Family | $8,800,000 |
| *Assemblage Tally:* | *$43,820,000* |

For the reasons described below, the CBRE Appraisal and Browne's corresponding testimony are not credible because they rely on a flawed and exaggerated application of plottage and because they rely on inadequate adjustments to poor sales comparables.

***Plottage Problems.*** Although the CBRE Report nowhere mentions the word "plottage," Browne testified that his valuation depends on that concept, which refers to the increase in value obtained when assembling several smaller parcels of land into one larger one, such that the sum of the whole is worth more than the sum of the parts.[296] According to

---

[296] *Plottage*, BLACK'S LAW DICTIONARY (12th ed. 2024); Transcript of Hearing Held 8/7/24 [Docket No. 171] at 60:20–61:11. The CBRE Report states that it was prepared in conformance with the Uniform Standards of Professional Appraisal Practice (USPAP). Trustee Ex. 174 at i. USPAP Standards Rule 1-4(e) discusses the concept of assemblage:

> When analyzing the assemblage of the various estates or component parts of a property, an appraiser must analyze the effect on value, if any, of the assemblage. An appraiser must refrain from valuing the whole solely by adding together the individual values of the various estates or component parts.

Browne, the highest and best use of the Tracts is as vacant land for development (either retail or townhome/multi-family), and plottage resulted from assembling roughly 9.54 acres because more and varied development opportunities are now available.[297] Browne's reliance on plottage is problematic.

First, Maple Heights assembled 9.54 acres, but the CBRE Report disassembled it. In other words, despite Browne's trial testimony touting the increased development opportunities from assembling 9.54 acres, the CBRE Report did not value the 9.54 acres as a single assemblage of developable property; the report instead carved up the global assemblage into five discrete and independent Tracts and valued each one separately. In the CBRE Report, the value placed on each Tract is *not* conditioned on that Tract's sale with the other Tracts as part of a larger assemblage or development plan.[298] And as the Assemblage Tally in the chart above reflects, Browne simply tallied each Tract value, resulting in a sum of $43.82 million. No "super plottage" happened by combining the five Tracts to reach, say, $47 million of value. According to the CBRE Report, any plottage for each Tract must exist, if at all, from the assemblage within each Tract.

Second, plottage resulting from assemblage appears to be impossible for two of the Tracts. For starters, Tract 2, Retail consists of only two tracts fronting Maple Avenue (4347 Maple Avenue and 4333 Maple Avenue), but there is a third-party-owned tract smack dab in the middle of them (4343 Maple Avenue) that MHI had attempted to purchase on multiple

---

Comment: Although the value of the whole may be equal to the sum of the separate estates or parts, it also may be greater than or less than the sum of such estates or parts.

USPAP Standards Rule 1-4(e) [Docket No. 179]. Thus, the process of assemblage may or may not result in plottage.

[297] Transcript of Hearing Held 8/7/24 [Docket No. 171] at 53:2–54:21, 60:1–16.

[298] Browne was cross-examined at trial about why his plottage theory and methodology were not mentioned in the CBRE Report and why plottage would apply to a single Tract, such as the Tung Tract. During that exchange, Browne seemed to offer a new theory that any buyer of a Tract would be purchasing it subject to a master-plan agreement, a significant condition or limitation that the CBRE Report does not mention. *See* Transcript of Hearing Held 8/7/24 [Docket No. 171] at 57:8–12, 59:16–60:16; Transcript of Hearing Held 8/7/24 [Docket No. 173] at 25:2–15, 38:8–17, 42:3–7; Transcript of Hearing Held 8/8/24 [Docket No. 177] at 49:17–50:24, 51:25–52:14.

occasions without success.[299] Thus Tract 2, Retail has no contiguous assemblage at all that could create plottage. And Tract Three, Townhome/Multi-Family, also known as the Tung Tract, was purchased by MHI in August 2016 for $3 million, yet the CBRE Report values that lot, by itself and not assembled with any other lot, as of November 2017, at $8.8 million. Plottage cannot possibly account for the dubious near tripling in value of the solitary Tung Tract in only 15 months.

Third, any plottage within the remaining Tracts appears minimal, just as plottage would be minimal for the entire 9.54 acres even if they are all somehow (despite the CBRE Report valuing each separately) considered assembled under a master-development plan. MHI's assemblage is a Swiss-cheese collection of properties with numerous holes that currently prevent unified development and control over the area, such as third-party properties that MHI has been unable to purchase, zoning that needs to be changed, deed restrictions that need to be lifted, and alleys and streets that need to be abandoned or dedicated. The more credible testimony at trial suggests it will be more difficult to achieve these things than Browne believes.

The holes along Maple Avenue are illustrative. Maple Avenue is the most important street for the Retail Tracts, yet three third-party properties split up those Tracts, including a critical gas-station lot on 4421 Maple Avenue that the owner has been unwilling to sell,[300] and 4343 Maple Avenue (discussed above), which is also held by an intransigent owner. Without the middle-piece 4343 lot, MHI is left with two corner lots with limited development options due to city-imposed setbacks.[301]

---

[299] Transcript of Hearing Held 8/6/24 [Docket No. 166] at 19:13–15, 20:5–6, 26:9–19, 102:21–103:4, 105:9–11.

[300] Transcript of Hearing Held 8/6/24 [Docket No. 166] at 19:16–20:4, 105:9–11; Transcript of Hearing Held 8/20/24 [Docket No. 211] at 5:18–6:15.

[301] A setback requires that a structure be a minimum number of feet from the street. Corner lots suffer from a double setback. Dallas, Tex., Code ch. 51P, art. 193, § 51P-193.118(a)(5) (2024). For example, for corner-lot 4333 Maple Avenue, any structure would have to be set back a minimum number of feet from both Maple Avenue and Wycliff Avenue. Given the corner-lot sizes, the setback restrictions, and the need for parking space, MHI could not even build a McDonald's or other drive-thru-type concept on either 4333 or 4347 Maple Avenue. Transcript of Hearing Held 8/13/24 [Docket No. 204] at 30:22–33:9; Lebowitz Ex. 51 at 3.

More illustrative holes are the streets and alleyways that would need to be abandoned to create a unified 9.54-acre assemblage and the additional zoning changes that would be desirable for development. The CBRE Report and Browne were more liberal—and less credible—in believing that city approvals for those changes would be fairly easy to get.[302] But Candace Rubin, an expert for the Lebowitz Defendants (discussed further below), and Lebowitz testified credibly that, for example, it is difficult to get changes like that past the Oak Lawn Committee,[303] a group of citizens that was formed in the 1980s to oversee proposed development in the Oak Lawn-defined district and who have the ear of city-council members.[304]

Overall, the CBRE Report and Browne's testimony overestimate plottage for their asserted value of the properties.

***Comp Complications.*** The Lebowitz Defendants designated Texas commercial-real-estate broker and property-tax representative Candace Rubin as their "geographically competent" expert to pick apart Browne's selection of sales comparables for his valuation and his related value adjustments.[305] She succeeded, despite her own credibility setbacks at trial.[306]

---

[302] *See* Transcript of Hearing Held 8/7/24 [Docket No. 171] at 7:18–9:11; Transcript of Hearing Held 8/8/24 [Docket No. 181] at 39:15–41:16.

[303] Transcript of Hearing Held 8/13/24 [Docket No. 200] at 36:3–38:14 (Lebowitz explaining the difficulty of getting changes to zoning); Transcript of Hearing Held 8/20/24 [Docket No. 220] at 70:4–74:24 (Rubin explaining the arduous process of changing zoning within the Maple Corridor). Rubin further testified that the Oak Lawn Committee refused to allow the rezoning required for HEB to build a supermarket within the PD-193 district. Transcript of Hearing Held 8/19/24 [Docket No. 212] at 49:10–50:7.

[304] Transcript of Hearing Held 8/20/24 [Docket No. 220] at 71:3–73:9.

[305] *See* Amended Witness and Exhibit List of the Lebowitz Defendants [Docket No. 149] at 2–3.

[306] Rubin's expert report (and her testimony) mostly addressed the sales comparables in Browne's report. Unfortunately, her report also had a short discussion about her opinion on the value of the purchase option in the 2017 lease to Playa Plata. *See* Lebowitz Ex. 51 at 9. When questioned at trial about that issue, she was not familiar with the subject or the facts surrounding the purchase option, leaving the Court to wonder who prepared the option language in her report and why she signed her report with that option language. Despite that blunder and credibility lapse, the balance of her testimony concerning the comparable sales was credible.

None of Browne's comparable sales in the CBRE Report were located within the Maple Corridor.[307] Instead, most were in Dallas neighborhoods with lower crime rates, higher levels of development, and without the zoning and deed restrictions that hampered the subject properties. For example, MHI's project was located near several tracts owned by the Dallas Housing Authority ("**DHA**"), which owns and operates a low-income, government-subsidized apartment complex and several administration buildings that offer drug-testing outreach.[308] The crime and homelessness on the DHA's properties spilled over onto the Maple Heights project area.[309] The credible evidence showed that those issues negatively affect the area's property values.[310] In contrast, the CBRE Report's comparable sales are from far superior neighborhoods—some being in the most superb areas of Dallas—and are not adequately adjusted for such a disparity.

Tract 1, Retail's first comparable sale ("**Retail Comp 1**") was an "industrial flex facility" located on the northern edge of Dallas's Design District along North Stemmons Freeway purchased for approximately $44.3 million ($109.00 per square foot) by the Dallas Mavericks professional basketball team, which then transformed the building into a training facility.[311] As Rubin noted, Retail Comp 1 differed from the subject properties in many respects: It was in a much better location with more traffic, it was fully assembled, and it was subject to zoning that allowed for a much higher building density. In addition, it also contained a usable,

---

Another note about Rubin's credibility: The Trustee alleged Rubin was biased based on her tax-appraisal-protest work for Lebowitz, but she also has worked for both MHI and (on unrelated matters) the Trustee. She adequately addressed any concerns about bias.

[307] *See* Trustee Ex. 174 at 23, 26, 31.

[308] Transcript of Hearing Held 8/13/24 [Docket No. 202] at 7:10–9:4; Transcript of Hearing Held 8/20/24 [Docket No. 211] at 17:15–19:14. The apartment complex is what would sometimes be referred to as "Section 8" housing. *See id.*

[309] Transcript of Hearing Held 8/13/24 [Docket No. 202] at 8:18–9:4; Transcript of Hearing Held 8/20/24 [Docket No. 211] at 18:7–17, 19:15–23.

[310] Transcript of Hearing Held 8/19/24 [Docket No. 214] at 53:2–21; Transcript of Hearing Held 8/20/24 [Docket No. 211] at 18:7–17.

[311] Trustee Ex. 174 at 24. The exact sale price was confidential, but, according to Browne, the listing broker indicated a sale price between $100 and $125 per square foot, so Browne estimated a sale price of $109.99 per square foot. *Id.*

85-percent-leased building that had an income stream.[312] Tract 1, Retail's second comparable sale ("**Retail Comp 2**") suffered from similar defects. Retail Comp 2 was a fully assembled site on the north side of Lemmon Avenue purchased for $15,127,560 ($116 per square foot) by HEB to potentially build a supermarket.[313] Located in an area along the southern edge of the upper-echelon city of Highland Park, Retail Comp 2, according to Rubin, enjoys a higher-income population, lower crime statistics, higher sale prices per square foot, and significantly higher rental rates.[314] Browne even noted the superior location of this area during his direct examination when discussing the neighborhood of the subject properties:

> So for [the Maple Corridor], it has not gotten that first initial charge of a large development like what we have for the subject, right. So there's still sales. There's people that are interested in buying over the last several years. But everybody's sort of waiting for that first large development to kick in before values are going to go much higher for the smaller pieces. *In other words, this neighborhood hasn't been proven yet. Like say for instance on Lemmon [Avenue]. Maple Avenue hasn't yet, but Lemmon has so it's slightly better.* And so I would characterize it as just at the beginning, or into the transition cycle.[315]

Like Retail Comp 1—and unlike the subject properties—Retail Comp 2 had substantial income-producing improvements when it was sold.[316] The remaining retail comparable sales have similar discrepancies when applied to the subject properties: fully assembled, better locations,

---

[312] *Id.*; Transcript of Hearing Held 8/19/24 [Docket No. 212] at 40:19–43:22; Lebowitz Ex. 51 at 4–5.

[313] Trustee Ex. 174 at 24.

[314] Transcript of Hearing Held 8/19/24 [Docket No. 212] at 43:23–52:13; Lebowitz Ex. 51 at 5.

[315] Transcript of Hearing Held 8/7/24 [Docket No. 170] at 69:9–19 (emphasis added). The suggestion that the Lemmon Avenue comp area is only "slightly" better than the Maple Heights area is not credible.

[316] Transcript of Hearing Held 8/19/24 [Docket No. 212] at 47:1–18; Trustee Ex. 174 at 24.

higher traffic, existing improvements, better zoning, and no deed restrictions.[317]

The comparable sales for the townhome/multi-family tracts fare no better. The same three comparable sales were used for each townhome/multi-family tract.[318] The second comparable sale ("**TH/MF Comp 2**") is located southeast of the Maple Corridor in Uptown Dallas and was purchased for $8,132,880 ($140 per square foot).[319] Rubin explained credibly why TH/MF Comp 2 differs significantly from the subject properties. Unlike the townhome and multi-family properties sold to the Lebowitz Entities, TH/MF Comp 2 was a fully assembled plot located in a superior area of Dallas with lower crime rates and existing improvements.[320] And whereas TH/MF Comp 2 was located in one of the nicest areas of Dallas, the subject properties abutted the DHA's low-income housing projects.[321] Further, TH/MF Comp 2 had much more advantageous zoning than did the subject properties, allowing for more building density and the development of a high-rise complex.[322] In contrast, the townhome and multi-family zoning for the subject properties restricted building heights to 36 feet.[323]

Browne testified that his comparable sales were all located outside the Maple Corridor because he was seeking those that were similar in size and development opportunity to the entire MHI and Arroyo Hondo assemblage, none of which, according to him, existed inside the Maple Corridor.[324] But Browne erred in comparing fully assembled, developed sites to the Swiss cheese owned by the Debtor and Arroyo Hondo; as noted above, the holes in that Swiss cheese were nowhere near filled or

---

[317] *See* Lebowitz Ex. 51 at 4–8.

[318] *See* Trustee Ex. 174 at 31–35.

[319] *See id.* at 31–32.

[320] *Id.* at 32; Transcript of Hearing Held 8/19/24 [Docket No. 212] at 71:25–72:17; Lebowitz Ex. 51 at 7.

[321] *See* Trustee Ex. 174 at 32; Transcript of Hearing Held 8/19/24 [Docket No. 212] at 71:25–72:17; Lebowitz Ex. 51 at 7.

[322] Trustee Ex. 174 at 32; Transcript of Hearing Held 8/19/24 [Docket No. 212] at 71:25–72:17; Lebowitz Ex. 51 at 7. The buyer in this sale constructed a 21-story high-rise apartment complex after the transfer. Trustee Ex. 174 at 32.

[323] Transcript of Hearing Held 8/21/24 [Docket No. 228] at 21:1–6.

[324] Transcript of Hearing Held 8/07/24 [Docket No. 170] at 66:7–23.

guaranteed to be filled. Moreover, even if fully assembled sites were an appropriate value barometer, only two of Browne's nine comparable sales were remotely close in size to the 9.54-acre subject properties, with most being under or just over a single acre,[325] and none of his "best" comparables (used for final values) included the near-ten-acre comparables.[326] In contrast, Rubin identified more than 20 comparable sales located within the Maple Corridor that Browne failed to use.[327]

Rubin's testimony regarding Browne's comparable sales was compelling. Her real-estate and tax work gave her an intimate knowledge of the Dallas area (and the Maple Corridor in particular), her own comparable sales, and a number of Browne's comparable sales. The Court agrees with her assessment that Browne's comparable sales were not so comparable at all but were instead like comparing "Earth to Venus."[328]

Moreover, Browne's adjustments to his comparable sales were not nearly enough to reconcile his comps' superior nature to that of the subject properties. Although Retail Comp 1 has freeway frontage and is located in a developed neighborhood with, according to Rubin, more than ten times the traffic of the Maple Corridor, Browne adjusted its value by only 25 percent.[329] There was also no adjustment for its superior zoning.[330] As discussed above, Retail Comp 2 was also in a superior location to the Maple Corridor, yet Browne's adjustment was a mere ten percent.[331] The ten-percent location adjustment is wholly inadequate when Retail Comp 2 is on the fringe of Highland Park in an area with higher traffic and retail rental rates that are double or triple those of the Maple Corridor.[332] TH/MF Comp 2's location in one of the most superb areas of

---

[325] *See* Trustee Ex. 174 at 23, 27, 31.

[326] As noted below, Browne's comp adjustments for size and other value-affecting factors were inadequate.

[327] *See* Lebowitz Ex. 51 at 2, 10–12.

[328] Transcript of Hearing Held 8/19/24 [Docket No. 212] at 72:13.

[329] *Id*. at 42:6–21; Trustee Ex. 174 at 25; Lebowitz Ex. 51 at 4–5.

[330] Transcript of Hearing Held 8/19/24 [Docket No. 212] at 72:13; Trustee Ex. 174 at 25; Lebowitz Ex. 51 at 4–5.

[331] Transcript of Hearing Held 8/19/24 [Docket No. 212] at 51:2–20; Trustee Ex. 174 at 25; Lebowitz Ex. 51 at 5.

[332] Transcript of Hearing Held 8/19/24 [Docket No. 212] at 51:2–20; Lebowitz Ex. 51 at 5.

Dallas also only yields a ten-percent adjustment in Browne's ap-
praisal.[333] The Court agrees with Rubin's testimony that such a small
adjustment for such a large disparity in location quality is insuffi-
cient.[334] In addition, none of Browne's comparables received a shape ad-
justment even though each comparable sale was fully assembled, as op-
posed to the subject properties, which contained numerous noncontigu-
ous tracts.[335]

In short, the CBRE Report does not explain how Browne selected his
percentage adjustments,[336] and while Browne testified that comparable
sales needed these adjustments due to their superiority,[337] those adjust-
ments were largely inadequate.

Due to the plottage problems and comp complications noted above, the
CBRE Report is not a reliable indicator of value of the properties trans-
ferred to the Lebowitz Entities.

### b. Chuck Dannis's opinion of value is credible.

The Lebowitz Defendants designated Chuck Dannis, a Texas certified
real-estate appraiser, as their expert to opine on the fair-market value
of the properties.[338] According to Dannis's appraisal report and his trial
testimony, the properties were worth $17,545,000 ($42.34 per square
foot) at the time of the transfers.[339] Dannis's credible opinion differed
from Browne's in that Dannis did not rely on any assumptions of a "mas-
ter plan" purchase or of any future activity by a potential buyer of the
properties, such as successful efforts to obtain changes in zoning regu-
lations or deed restrictions, or additional purchases of land from

---

[333] Transcript of Hearing Held 8/7/24 [Docket No. 173] at 38:18–40:18; Trustee Ex. 174 at 33–34.

[334] *See* Transcript of Hearing Held 8/19/24 [Docket No. 212] at 71:16–20, 72:3–17.

[335] *See* Transcript of Hearing Held 8/7/24 [Docket No. 173] at 38:8–17; Trustee Ex. 174 at 24–29, 32–34.

[336] Transcript of Hearing Held 8/8/24 [Docket No. 181] at 45:7–14.

[337] *See id.* at 42:3–13.

[338] *See* Amended Witness and Exhibit List of the Lebowitz Defendants [Docket 149] at 4.

[339] Lebowitz Ex. 48 at 7; *See* Transcript of Hearing Held 8/21/24 [Docket No. 228] at 50:3–21.

intransigent owners. Instead, he appraised the properties "as is."[340] Under the facts of this case, Dannis's approach is more appropriate and more credible given the significant work yet to be done and the significant properties yet to be purchased to make the entire 9.54 acres a fully assembled tract.

Dannis's comps were also superior to Browne's. All but one of Dannis's 15 comparable sales were located within the Maple Corridor, with that one being located in an area sufficiently similar to the Maple Corridor to not warrant a location adjustment.[341] Dannis appropriately applied minimal plottage value to the properties sold to EUS80, which consisted of the Schultz Tract, the Sarris Tract, the Tung Tract, 4501 and 4507 Maple Avenue, 4443 Maple Avenue, and 4431 Maple Avenue.[342] While most of the comparable sales had the same zoning as the subject properties, those that did not were properly adjusted for their slightly better zoning, and there were also proper adjustments for their lack of deed restrictions.[343] Simply put, the CBRE Report is not credible; Dannis's appraisal is. The Court finds that the properties transferred to the Lebowitz Entities in 2017 and 2018 had a total fair-market value of $17,545,000 ($42.34 per square foot) at the time of the transfers: $13,315,000 ($46.09 per square foot) for the 2017 transfers and $4.23 million ($33.71 per square foot) for the 2018 transfers.[344]

For the 2017 and 2018 transfers together, the Lebowitz Entities paid a total sale price of $17,218,060 ($41.45 per square foot), just a hair less than Dannis's opinion of fair-market value. The Lebowitz Entities likewise paid marginally less than fair-market value for the 2017 and 2018 transfers considered as two sales: $13 million ($45 per square foot) for the 2017 transfers and $4,218,060 ($33.36 per square foot) for the 2018 transfers. TUFTA, however, does not require MHI to achieve an exact

---

[340] Transcript of Hearing Held 8/20/24 [Docket No. 222] at 82:22–25, 83:1–2. Like all admitted appraisals of the properties, Dannis's appraisal assumed that the properties were vacant. *See id.* at 81:23–25, 82:1–5.

[341] *See* Lebowitz Ex. 48 at 66, 76.

[342] *See id.* at 77; Transcript of Hearing Held 8/21/24 [Docket No. 228] at 16:14–18:22.

[343] *See* Lebowitz Ex. 48 at 76–78.

[344] The square-footage numbers in Dannis's report differ slightly from those stipulated by the parties in Exhibit A of the Second Amended Joint Pre-Trial Order [Docket No. 209]. That difference is immaterial to the findings on valuations.

mathematical equivalency.[345] Rather, MHI need only receive a value within a reasonable range of the properties' fair-market value.[346] With a difference of only roughly $1 per square foot between the value MHI received and the properties' fair-market value—both for the 2017 and 2018 transfers together and as separate sales—MHI received value well within that range.[347] MHI received reasonably equivalent value for the transfers, even without considering the value of the leases and options, discussed below.[348]

### c. The other evidence at trial does not alter the Court's determination of the value of the properties.

The parties point to various other pieces of evidence in support of their assertions of value for the properties transferred. The Court has considered them all and gave them the weight they deserved. For example, other appraisals were discussed and admitted at trial, but because the authors of the appraisals were not in Court to be cross-examined about their conclusions, the Court admitted the appraisals for limited purposes. The Trustee also pointed to a letter, purportedly authored by Rubin, opining that the subject properties were worth between $80 and $125 per square foot.[349] However, evidence at trial indicated that Rubin had no hand in preparing the letter and never held such an opinion.[350]

The Trustee also offers various statements (written and verbal) by Silverman and Lebowitz that purportedly support the Trustee's sky-high value assertions. The Court considers many of those statements to be

---

[345] *See In re Wyly*, 607 B.R. at 873.

[346] *See* TEX. BUS. & COM. CODE § 24.004(d); *Golf Channel*, 487 S.W.3d at 581 n.117 (citing *Coan v. Fleet Credit Card Servs., Inc. (In re Guerrera)*, 225 B.R. 32, 36 (Bankr. D. Conn. 1998) (explaining that "mathematical precision" is not required so long as there is no "significant disparity" between the values exchanged)).

[347] *See, e.g., Golf Channel*, 487 S.W.3d at 581 n.117 (citing *Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769, 770–72 (6th Cir. 1995) (finding that the values exchanged between a gambler and a casino were reasonably equivalent despite the house advantage)).

[348] The Court's conclusion regarding the 2017 and 2018 sales is the same whether they are considered six different sales to six different assignees, three sales based on three different closing dates, or two sales based on two sale contracts: Maple Heights received reasonably equivalent value for every single transfer.

[349] *See* Trustee Ex. 169.

[350] *See* Transcript of Hearing Held 8/20/24 [Docket No. 211] at 22:22–26:24.

puffery (or in one case—Lebowitz's buy-them-for-$120.50-per-square-foot statement to Buck Acquisitions—sarcasm), and the Court considered and weighed any statements that were not mere puffery or sarcasm.

Likewise, none of the other evidence at trial moved the needle for the Court on the value of the properties.

### d. Any value the options and leases had buttresses the Court's determination of reasonably equivalent value and does not alter the Court's determination.

While the purchase price paid by the Lebowitz Entities alone was enough to constitute reasonably equivalent value, the leases and related options (lease-extension options and repurchase options) also provided some economic benefit to MHI. Silverman and Lebowitz testified credibly that MHI would not have sold the properties to the Lebowitz Entities but for the leases and options,[351] which gave MHI and its wholly owned subsidiary the opportunity to move forward with the project, obtain the necessary zoning entitlements, complete the assemblage, and reacquire the properties. Playa Plata received the direct benefit of the leases and options, but Maple Heights received that value indirectly by the corresponding increase in value of its wholly owned subsidiary.

The Court need not quantify the precise mathematical dollar value of those benefits. Instead, the Court is more than comfortable concluding that the project lifeline from the leases and options gave Maple Heights value.[352] That value, together with the sale proceeds, unquestionably provided Maple Heights a package of reasonably equivalent value for the transfers.

---

[351] Transcript of Hearing Held 8/6/24 [Docket No. 166] at 52:3–13, 54:23–55:2; Transcript of Hearing Held 8/13/24 [Docket No. 200] at 54:12–20.

[352] *See Golf Channel*, 487 S.W.3d at 575 ("Importantly, however, the 'requirement of economic benefit to the debtor does not demand consideration that replaces the transferred property with money or something else tangible or leviable that can be sold to satisfy the debtor's creditors' claims.'" (quoting *Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.)*, 267 B.R. 602, 612 (B.A.P. 8th Cir. 2001))).

***Mathematical Mires.*** None of the expert reports alter the Court's independent determinations that the leases and embedded options provided value to MHI and that such value—coupled with the sale proceeds—provided MHI reasonably equivalent value for the properties transferred.

First, Craig Jacobson, a valuation and solvency consultant, provided the Trustee an expert report that compared the CBRE Report's valuation of the properties, on the one hand, to the value MHI received from the sales, on the other hand.[353] After weighing those mathematical figures, Jacobson concluded MHI did not receive reasonably equivalent value. Jacobson's report is fatally flawed because it relies solely on the sky-high values in the CBRE Report for the value of the properties transferred.[354]

Second, Dean Castelhano, a commercial-mortgage banker, provided an expert report[355] for the Lebowitz Entities that valued:

- the 2017 lease to Playa Plata, calculated by the difference between the alleged fair-market rent over the lease term and the alleged below-market actual rent over the lease term. At trial, the Lebowitz Entities agreed not to rely on this part of the report.[356]

- the purchase option contained in the 2017 lease,[357] calculated by the difference between the fair-market value of the properties when they were sold (regardless of what the number is) and the "Strike Price" (the price MHI sold the properties for, plus the 15% repurchase premium, or $14.95 million).[358]

---

[353] Expert Report of Craig Jacobson dated January 16, 2024, Trustee Ex. 178. The report also addressed MHI's alleged unreasonably small capital.

[354] The Court thus need not address potential problems with Jacobson's analysis of the value MHI received in the sales.

[355] Expert Report of Dean Castelhano dated May 30, 2024, Lebowitz Ex. 131.

[356] *See* Transcript of Hearing Held 8/8/24 [Docket No. 178] at 46:6–47:5; Transcript of Hearing Held 8/26/24 [Docket No. 242] at 26:4–9.

[357] His report does not value the 2018 lease or option, although Castelhano testified the formula would work for the 2018 sale as well.

[358] Lebowitz Ex. 131 ¶¶ 16, 20.

○ For example, if the properties when sold were worth $30 million, then given the Strike Price of $14.95 million, the "Option Value" would be $15.05 million, representing the difference between the fair-market value and the Strike Price ($30 million minus $14.95 million).

○ But if the properties when sold had a value equal to or less than the Strike Price, then the Option Value would be zero.

Castelhano's simplistic formula has superficial appeal in the first example, where the properties were worth over $30 million, and Playa Plata had the option to purchase them for only $14.95 million. That would be a potentially valuable option. But according to Castelhano's formula, since the Court has found that the properties sold in 2017 were worth only $13,315,000, less than the $14.95 million Strike Price, then the option had no value. Castelhano appears to value the option as if it were exercised on the 2017 sale date rather than held beyond such date. That view of option value is too myopic under the facts of this case, and it's inconsistent with Castelhano's conclusion that "[t]he ability alone, to control the 2017 Properties, during the term of the 2017 Lease, and re-purchase them per the Option, is and was an extremely valuable piece of the total consideration received by Maple Heights in connection with the sale of the 2017 Properties to the Lebowitz Defendants."[359] The 2017 purchase option did indeed have value, like a forbearance agreement that allowed Maple Heights more chances to develop the project.[360] Castelhano's formula is a bust.

---

[359] *Id.* ¶ 21.

[360] *Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.)*, 2002 WL 31412465, at *6 (S.D.N.Y. Oct. 24, 2002); *see also Lowe v. B.R.B. Enters. (In re Calvillo)*, 263 B.R. 214, 220 (W.D. Tex. 2000) ("In addition, an economic benefit may flow from a debtor's ability to keep his business in operation as a result of his entering into the challenged transaction. Such an economic benefit is considered value for purposes of § 548."); *Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1127–27 (5th Cir. 1993) (economic benefits to Chapter 11 debtor-aircraft manufacturer from keeping its affiliate in operation by making payments for fuel to supplier of affiliate was "value" for § 548 fraudulent-transfer purposes), *abrogated on other grounds by Tex. Truck Ins. Agency v. Cure (In re Dunham)*, 110 F.3d 286, 288–89 (5th Cir. 1997)).

Third, Jacobson produced a rebuttal expert report to contest Castelhano's opinion of option value.[361] Although the Court has already found the Castelhano report not terribly helpful, Jacobson's rebuttal report has its own flaws, a few of which are noted here:

- After criticizing Castelhano for valuing the 2017 option as if it were exercised on the 2017 sale date (a valid criticism), Jacobson states that the option should have been calculated based on the value of the transferred properties at the *end* of the option term.[362]

  - It is difficult to square this conclusion with the Court's task of determining the value of what MHI received at the time of the transfers (not at the end of the option/lease term).

- Jacobson states that the option is not transferable, so if Playa Plata could not exercise it, then Playa Plata could not even sell or transfer it to obtain value.[363]

  - The credible evidence at trial suggests that Lebowitz—who was more than generous and patient with his extensions of the lease/option deadlines—would have approved a transfer of the lease/option if that were necessary.

- Jacobson criticizes the sentence in the Castelhano report that the Court found credible: that MHI's ability to control the properties and to repurchase them was valuable consideration. According to Jacobson, "Maple Heights controlled the 2017 Properties before the 2017 Transaction, so it makes no sense to state that this was an element of consideration that they received in the transaction."[364]

---

[361] Rebuttal Report of Craig Jacobson dated July 8, 2024, Lebowitz Ex. 197. Castelhano's report and Jacobson's rebuttal report also dispute whether the 2017 lease had value to MHI, but as already mentioned, the Lebowitz Defendants opted not to rely on Castelhano's opinion on lease value.

[362] *Id.* ¶¶ 19, 20.

[363] *Id.* ¶ 21.

[364] *Id.* ¶ 29.

- o It is true that Maple Heights controlled the 2017 prop-
  erties before the 2017 transaction, but Maple Heights
  would have lost that control through foreclosure or
  other liquidation if it didn't do something. It couldn't get
  a traditional bank loan, which would have permitted
  Maple Heights to remain in control. Instead, Maple
  Heights negotiated the best deal it could with Lebowitz,
  who insisted on purchasing the properties and leasing
  them *back* with a repurchase option. There is no ques-
  tion MHI received consideration by obtaining the right
  to control the properties (with limits) after the sale ra-
  ther than selling the properties outright.

- Jacobson concludes that one of the reasons the 2017 purchase op-
  tion had no value is that neither MHI nor Playa Plata had the
  intent or the capital to exercise it.[365]

  - o There is sufficient credible evidence in the record that
    (a) Maple Heights and its three human managers—Sil-
    verman (the vision guy and developer), Landwehr (the
    money guy), and Harris (the boots-on-the-ground-get-
    things-done guy)—intended Playa Plata to repurchase
    the properties when possible, and (b) there was a rea-
    sonable enough chance of success to make a good gam-
    ble they could further develop the properties even
    though Maple Heights and Playa Plata may have been
    cash-strapped at the time.

In short, the expert reports of Jacobson and Castelhano did not help the
Court much in understanding the evidence or in determining a fact in
issue, and they also did not use reliable principles and methods, so the
Court gives the reports (and related expert trial testimony) little weight.

After considering all the evidence admitted at trial, the Court finds that
MHI received a package of reasonably equivalent value for the property
transfers through its receipt of sale proceeds and the increase in subsid-
iary value attributable to Playa Plata's receipt of the leases, lease-ex-
tension options, and property-repurchase options.

---

[365] *Id.* ¶ 24.

## B.    Donald Silverman did not breach his fiduciary duties to Maple Heights.

The Trustee alleges that Silverman breached his fiduciary duties to MHI by the "orchestration" of the transfers, by the secrecy of his dealings with the Lebowitz Defendants, and by the "disappearance" of MHI's cash.[366]

To prevail on a breach-of-fiduciary-duty claim under Texas law, a plaintiff generally must show: (1) the existence of a fiduciary relationship, (2) a breach of a fiduciary duty, and (3) a corresponding injury to the plaintiff or a benefit to the defendant.[367] For the reasons explained below, Silverman owed fiduciary duties to MHI, but the Trustee failed to prove any breach of those duties.

The Texas Business Organizations Code allows a limited-liability-company agreement to expand or restrict fiduciary duties of managers and members,[368] so the statute implies such duties exist in favor of the company, but it doesn't state so expressly as it does for officers and directors of some corporations.[369] Texas caselaw has filled the gap by concluding that LLC managers owe fiduciary duties to the company under agency-law principles.[370] Accordingly, because the MHI company agreement does not expand or restrict Silverman's duties as manager,[371] he owed MHI fiduciary duties of loyalty, due care, and obedience.[372] The

---

[366] First Amended Adversary Complaint [Docket No. 72] ¶ 108; Second Amended Joint Pre-Trial Order [Docket No. 209] ¶ 65.

[367] *UTSA Apartments, L.L.C. v. UTSA Apartments 8, L.L.C. (In re UTSA Apartments 8, L.L.C.)*, 886 F.3d 473, 492 (5th Cir. 2018); *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied); *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017).

[368] *See* Tex. Bus. Orgs. Code § 101.401.

[369] *See, e.g.*, *id.* § 22.221(a).

[370] *Katz v. Intel Pharma, LLC*, 2020 WL 3871493, at *2 (S.D. Tex. July 9, 2020) (citing *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002); *ETRG Invs. v. Hardee (In re Hardee)*, 2013 WL 1084494, at *3–4 (Bankr. E.D. Tex. Mar. 14, 2013)).

[371] *See* Lebowitz Ex. 107.

[372] *See Gearhart Indus. v. Smith Int'l*, 741 F.2d 707, 719 (5th Cir. 1984). Although the First Amended Complaint (¶ 108) also alleges a breach of the duties of "good faith and fair dealing, and/or full disclosure," those duties appear to be subsumed within the duty of loyalty. *See, e.g.*, *Loy v. Harter*, 128 S.W.3d 397, 407 (Tex. App.—Texarkana 2004, pet. denied) ("The duty of loyalty dictates that a corporate officer or director must

Trustee doesn't question Silverman's obedience, so only his loyalty and due care are disputed.

### 1. Silverman did not breach the duty of loyalty.

The duty of loyalty requires a fiduciary to act in good faith and to not allow his own personal interests to prevail over the principal's interests.[373] To act in good faith, an LLC manager must "act with an intent to confer benefit on the corporation."[374] A manager's duty of loyalty is looked at even more carefully when he is "interested" in the particular transaction.[375] A manager is considered "interested" in the transaction if he: (1) personally profits from a transaction by self-dealing with the LLC or usurping a corporate opportunity; (2) personally transacts with the LLC as a buyer or seller of assets; (3) transacts business in his fiduciary capacity with another entity of which he is also a fiduciary or significantly financially associated; or (4) transacts business in his fiduciary capacity with a family member.[376] Once interested, the manager has the burden of proof to show that the transaction was entirely fair to the LLC.[377]

The Trustee doesn't expressly argue Silverman was "interested," but the charge is implied in the allegation that Silverman breached his duties by orchestrating the transfers, by doing so in secret, and by not accounting for sale proceeds. There is no credible evidence to support any of the Trustee's implied or express allegations of Silverman's disloyalty or his interestedness in the transaction.

---

act in good faith and must not allow his or her personal interest to prevail over the interest of the corporation. The duty of loyalty is described as requiring an extreme measure of candor, unselfishness, and good faith on the part of the officer or director.").

[373] *Gearhart*, 741 F.2d at 719; *Landon v. S & H Mktg. Grp.*, 82 S.W.3d 666, 672 (Tex. App.—Eastland 2002, no pet.).

[374] *Gearhart*, 741 F.2d at 720 (citing *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 578 (Tex. 1963)).

[375] *Ye v. Zhang*, 2021 WL 5862093, at *9 (S.D. Tex. June 8, 2021) (citing *Gearhart*, 741 F.2d at 719).

[376] *See Gearhart*, 741 F.2d at 719–20 (citing Texas caselaw).

[377] *Id.* at 720; *Ye*, 2021 WL 5862093, at *9.

***Scheme Skepticism.*** The Court is skeptical of the scheme allegation, which is the most curious and uncomfortable one of the whole trial. According to the Trustee, Silverman orchestrated a scheme—with the Lebowitz Defendants—to get the properties out of MHI's hands and into Lebowitz's hands, to wipe out creditors, and to then develop the properties with Lebowitz. According to this theory, Silverman *never* intended to exercise the purchase options because Silverman knew from the get-go that MHI's business plan would fail.[378] Why is this allegation so curious and uncomfortable? Keep in mind that the Trustee's counsel in this lawsuit also represents Landwehr, who (*with* Silverman and Harris) developed the Maple Heights vision, approved the 2017 sale-lease-back transaction, and benefitted from the 2017 transaction when he and his affiliates received loan repayments or placement fees from the sale proceeds. Only when things didn't work out for Maple Heights and he faced the potential ire of his German investors and acquaintances did Landwehr change his tune; he then raised litigation funds from investors and allowed his counsel to represent the Trustee in filing this lawsuit, which alleges (in part) that the 2017 transaction—which, again, Landwehr developed, implemented, and benefitted from—was actually a fraud. And to make things even more uncomfortable, the Trustee relied solely on one law firm for advice on who might have breached their fiduciary duties: the firm that also represents Landwehr.[379] Predictably, the Trustee did not sue Landwehr for breach of fiduciary duty for his involvement in the 2017 sale-leaseback transaction.

Whatever Landwehr's motivations were in instigating this lawsuit, there is no credible evidence to support the Trustee's claims, including that of Silverman's disloyalty. Silverman intended to benefit Maple Heights through the entire project. After Maple Heights couldn't obtain the more traditional and favorable hard-money loans it needed for a successful project, Rubin—whom the Trustee has employed in unrelated cases to appraise and sell properties for him—introduced MHI to Lebowitz, an honest but shrewd negotiator who offered to provide financing through the structure of a sale-leaseback with a repurchase option. Lebowitz was generous with extensions on the purchase-option deadlines, allowing Maple Heights to continue to try to save the project. The

---

[378] *See, e.g.*, First Amended Adversary Complaint [Docket No. 72] ¶¶ 24–28, 34–35.

[379] *See* Transcript of Hearing Held 8/23/24 [Docket No. 236] at 27:1–16.

project ultimately failed, but there is no credible evidence that Silverman and Lebowitz were in cahoots to make Maple Heights fail so that Silverman could develop the properties for Lebowitz.

***Secrecy Cynicism.*** The Court already expressed doubts about the secrecy allegation when addressing the concealment badge of fraud. To recap: the Trustee failed to prove that any creditor or investor who was entitled to information about the transaction didn't receive it. And to the extent the Trustee suggests Harris and Landwehr were kept in the dark, the record demonstrates overwhelmingly that they were both intimately involved with the transactions while they were still managers and members of Maple Heights.[380]

***Pilfering Pushback.*** The Court pushes back on the suggestion that Silverman pilfered proceeds from the sale closings. Section J of the First Amended Complaint (¶¶ 70–75) alleges that Silverman didn't properly account for the proceeds of the sales to the Lebowitz Entities; the Trustee even suggests Silverman may have purchased a new house with the proceeds. There was credible evidence showing the uses of the sale proceeds, including loan repayments to noninsiders and payments to insiders (including Landwehr, Harris, and Silverman) and their affiliates for loans, placement fees, and development fees. The Trustee and his counsel did not appear to question those disbursements at trial. Although the Trustee questioned Playa Plata's involvement in the transaction and its receipt from MHI of $4 million after the closing of the 2017 transaction, the Court elsewhere in this document has explained why it was not inappropriate for MHI to conduct business using its wholly owned subsidiary.

In short, the Trustee failed to show Silverman pilfered proceeds.

***Interestedness Issues.*** Silverman didn't scheme, he didn't act in secrecy, and he didn't pilfer proceeds, so he cannot be considered "interested" in the sales for those reasons. The Trustee does not appear to argue that Silverman was "interested" due to postclosing payments to

---

[380] *See, e.g.*, Transcript of Hearing Held 8/12/24 [Docket No. 194] at 23:3–5 (Lebowitz testifying that his dealings with MHI were predominantly with Harris); Transcript of Hearing Held 8/5/24 [Docket No. 160] at 95:5–17 (Silverman testifying that Harris approached Lebowitz regarding the 2018 transfers); Transcript of Hearing Held 8/6/24 [Docket No. 164] at 82:11–83:8 (Silverman testifying that MHI would only purchase properties if all managers agreed).

him or his affiliates (some of whom—LFRC, LLC and MQ Rockwall—involved both Landwehr and Silverman).[381] Even if Silverman were somehow considered "interested" in the sales because of postclosing payments to him, the Court finds that the transactions in both 2017 and 2018 were entirely fair to MHI, which received reasonably equivalent value for the transfers to the Lebowitz Entities. It is true that both Silverman and Landwehr received postclosing compensation for their efforts in 2017 when their respective development fees were paid, but those payments were secondary to the interests of MHI in completing the sales.[382]

### 2.  Silverman did not breach the duty of care.

The duty of care requires an LLC manager to be "diligent and prudent" in managing its affairs, meaning he must act with such care as "an ordinarily prudent man would use under similar circumstances."[383] Under the business-judgment rule, however, courts refuse to impose liability absent a showing that the challenged decision lacks a business purpose; is tainted by a conflict of interest; is so egregious as to amount to a no-win decision; or results from an obvious and prolonged failure to exercise oversight or supervision.[384] In other words, an LLC manager's negligence, no matter how unwise or imprudent, does not constitute a breach of the duty of care so long as the acts are within the exercise of

---

[381] After hearing the detailed evidence at trial about where the sale proceeds went, the Trustee hasn't suggested those specific payments to Silverman, Landwehr, and Harris were inappropriate, and the damages models for the Trustee's breach-of-fiduciary claim appear unrelated to those amounts. *See* Plaintiff's Closing Argument PowerPoint Demonstrative [Docket No. 258-1] at 133.

[382] *Cf. Gearhart*, 741 F.2d at 720 ("In Texas, a director is permitted to profit personally from an interested transaction, but his profit must be incidental to the promotion of corporate interests."). Silverman testified that was the first time he was paid for his work on the project. Transcript of Hearing Held 8/6/24 [Docket No. 166] at 77:7–13.

[383] *Gearhart*, 741 F.2d at 720 (citing *McCollum v. Dollar*, 213 S.W. 259, 259, 261 (Tex. Comm'n App. 1919, holding approved)).

[384] *Id*. at 721; *Brickley v. Scattered Corp. (In re H & M Oil & Gas, LLC)*, 514 B.R. 790, 814–15 (Bankr. N.D. Tex. 2014) (citing *Roth v. Mims*, 298 B.R. 272, 282–83 (N.D. Tex. 2003)); *see Cates v. Sparkman*, 11 S.W. 846, 849 (Tex. 1889) (establishing the business-judgment rule).

his discretion and are aimed at furthering the development or prosecution of the business.[385]

***Care Concerns.*** The Trustee points to several alleged Silverman failures that touch on the duty of care, even though they're not expressly labeled that way. According to the Trustee, Silverman: (a) tried to develop the properties using a risky and more expensive form of financing (sale and leaseback, with option to repurchase) rather than the more traditional mortgage financing from a bank; (b) sold properties to the Lebowitz Entities at fire-sale prices; (c) didn't try to raise funds in 2018 to exercise the purchase option under the December 2017 sale-leaseback; and (d) continued to try to develop the properties rather than liquidating. These overlapping claims are all without merit.

First, MHI tried to get a bank loan but was unable to secure such traditional financing with a sufficient loan-to-value ratio to accomplish MHI's goals.[386] Silverman, Landwehr, and Harris jointly decided to work with Lebowitz in 2017 on the repurchase option, and Silverman and Harris went back to Lebowitz a second time in 2018 after Landwehr was arrested. The Court is comfortable that Silverman—who had years of experience developing commercial properties—exercised due care in making an informed decision about which forms of financing were available and the risks and rewards available with each. At the least, Silverman's decision to move forward with Lebowitz's proposed form of financing falls squarely within the business-judgment rule.

Second, Silverman sold the properties to the Lebowitz Entities for reasonably equivalent value (and for nearly exactly fair-market value), so

---

[385] *In re H & M Oil & Gas, LLC*, 514 B.R. at 814–15 (citing *Roth*, 298 B.R. at 282–83); *Cates*, 11 S.W. at 849 ("[I]f the acts or things are or may be that which the majority of the company have a right to do, or if they have been done irregularly, negligently, or imprudently, or are within the exercise of their discretion and judgment in the development or prosecution of the enterprise in which their interests are involved, these would not constitute such breach of duty, however unwise or inexpedient such acts might be, as would authorize the interference by the courts at the suit of a stockholder.").

[386] Transcript of Hearing Held 8/6/24 [Docket No. 166] at 50:11–52:6; Lebowitz Ex. 51 at 9 (Rubin expert report, noting in part that "Sands [Harris] also shared with me MHI's inability to find a lender that would loan more than 50% of what they paid for the properties").

the Trustee's fire-sale theory has no merit. Silverman exercised due care when MHI obtained the prices it did.

Third, Silverman testified credibly that he tried to raise funds for the repurchase options, unfortunately without success. The Trustee complained at trial that Silverman didn't offer into evidence a single email showing that he tried to obtain financing in 2018 to exercise the purchase option in the December 2017 sale-leaseback. But Silverman was not required to use any such document as an exhibit, and the Trustee didn't prove that he requested such communications in a document request or that any such request went unanswered. Instead, the Court is aware of only one motion to compel, filed by the Trustee in the main bankruptcy case, requesting the turnover of various documents from Silverman. That motion was dropped without fanfare after the Trustee evidently obtained what he needed.[387] Given the other credible evidence that Silverman and MHI tried unsuccessfully to obtain financing both in 2017 and 2018, the Court will not hold the lack of a corroborating email in evidence against him. Silverman exercised due care in seeking financing in 2017, 2018, and even in 2019.

Fourth, the decision whether to abandon a business's going-concern value by liquidating its assets for the benefit of all stakeholders is one that requires significant discretion and judgment, and Silverman's attempt to maintain MHI as a going concern is one that is protected under the business-judgment rule. The Trustee has made no showing that the challenged decision lacked a business purpose; was tainted by a conflict of interest; was so egregious as to amount to a no-win decision; or resulted from an obvious and prolonged failure to exercise oversight or supervision. The Court refuses to second-guess Silverman's decisions with the clarity of hindsight, which would defeat the purpose of the Texas business-judgment rule.

Based on the totality of the evidence at trial, and for the foregoing reasons, Silverman did not breach his fiduciary duties to Maple Heights.

---

[387] *See In re Maple Heights Invs.*, No. 21-30521-swe7, Docket Nos. 31 (motion), 61 (Silverman response), 68 (Notice of Withdrawal of Motion) ("As of December 1, 2023, the document production to Trustee's counsel is sufficient to withdraw his motion to compel and the Trustee withdraws his motion.").

## V.  Conclusion

The Trustee shall take nothing on Counts I through IV of the Complaint. The Trustee abandoned Count V. The parties should set a status conference within 60 days of the entry of these findings and conclusions to discuss, if necessary, resolution of the parties' respective requests for attorney's fees and any other open issues before the Court enters a final judgment.